**JOSTENS, INC., Respondent,**

v.

**FEDERATED MUTUAL INSURANCE COMPANY, petitioner, Appellant,**

**Employers Insurance of Wausau, A Mutual Company, Defendant.**

**Employers Insurance of Wausau, Third–Party Plaintiff,**

v.

**Jostens, Inc., et al., Third–Party Defendants.**

**No. C9–99–1452.**

Supreme Court of Minnesota.

June 22, 2000.

Rehearing Denied July 25, 2000.

---

Laura J. Hanson, Stacy A. Broman, William M. Hart, Meagher & Geer P.L.L.P., Minneapolis, for appellant.

Mark M. Nolan, Stapleton, Nolan & Hynes P.A., St. Paul, for respondent.

## OPINION

LANCASTER, Justice.

Respondent Jostens Incorporated commenced an action against appellant Federated Mutual Insurance Company in Ramsey County District Court for defense costs and indemnification stemming from chemical contamination at a Jostens operating plant site. Federated subsequently filed a motion for summary judgment. After the court denied this motion, Federated moved the court to certify two questions as "important and doubtful" pursuant to Minn. R. Civ.App. P. 103.03(h) in order to immediately appeal those questions. The court granted Federated's motion, but the Minnesota Court of Appeals dismissed Federated's appeal, holding that the questions had been improperly certified. We affirm the court of appeals, but on different grounds.

Beginning in 1964, Jostens operated a manufacturing facility in Princeton, Illinois. In addition to other chemicals, Jostens used tricholoroethane (TCE) to degrease and clean equipment during its manufacturing process. Until 1976, Jostens disposed of TCE in a filter bed that it had constructed on its property pursuant to acceptable industry practices at that time. The filter bed was a square pit in the ground that measured approximately 10 feet in length, width, and depth. The pit was lined with rocks, sand, and gravel, which were intended to filter and cleanse industrial wastes that were deposited in the pit. TCE was not placed on the Environmental Protection Agency's (EPA) list of hazardous substances until 1980, and land disposal of the substance was not banned until 1986.

In 1981, Jostens learned that its own property was contaminated by TCE and, pursuant to its environmental consultant's advice, Jostens removed the filter bed. In 1988, an environmental consultant retained by the EPA Hazardous Site Division found "shallow" soil contamination on Jostens' property. However, the EPA did not order Jostens to take any remedial action at that time.

In 1994, Springwood Associated Limited Partnership, which owned property adjacent to Jostens' Princeton plant, conducted soil and groundwater tests through an environmental consultant, ATEC. Those tests revealed TCE contamination on Springwood's property that originated from Jostens' plant. In March 1995, Springwood informed Jostens of ATEC's findings, asserted that Jostens was responsible for the contamination, and stated that Jostens, as a "responsible party," should clean it up. Springwood also urged that "all site investigation and remedial feasibility studies [should] be performed under the auspices of [the Illinois] EPA." Springwood subsequently filed suit against Jostens in federal court. On May 3, 1995, Jostens received notice from the United States EPA that it intended to take soil and groundwater samples from the Jostens property. Because Jostens knew that these samples would reveal contamination, it voluntarily entered the Illinois EPA's pre-notice environmental cleanup program on May 30, 1995.

Federated insured Jostens under general liability policies from 1964 to 1979. Until 1971, those policies covered property damage like the groundwater contamination at the Jostens plant. The pre–1971 policies also provided unlimited coverage for defense costs and at least $100,000 in indemnity coverage. However, beginning in January 1971, Federated's policies contained a qualified pollution exclusion that limits Jostens from coverage under those policies. Federated's policies contained a limit on indemnity coverage, but did not contain a limit for defense costs. In December 1995, Jostens notified its insurance broker of the groundwater and property contamination, who then forwarded the notice to Federated. In September 1996, Federated denied both the duty to defend and to indemnify Jostens.

In November 1996, Jostens commenced an action against Federated in Ramsey

County District Court for defense costs and indemnification. The parties subsequently engaged in extensive and complex pretrial litigation. This included a motion by Jostens in June 1998 to amend its complaint to add Employers Insurance of Wausau as an additional defendant. Jostens argued that Wausau had been its primary general liability insurer between 1979 and 1985, and that Jostens had discovered occurrences that contributed to the TCE contamination during those periods. The district court initially denied the motion, but when Jostens brought the same motion six months later, the district court granted it. Wausau, in turn, filed a third-party complaint against four other insurance companies, claiming that they had all insured Jostens between 1964 and 1985.

Federated's appeal to this court arises out of its October 1998 summary judgment motion. Jostens also moved for partial summary judgment at that time. By an order filed February 12, 1999, the district court granted Jostens' motion while denying Federated's motion. In its order, the district court found that, cumulatively, the EPA's May 1995 site investigation notice, Springwood's March 1995 request that Jostens fully investigate the site and study remediation options, and the ATEC report were "tantamount to a suit, triggering Federated's duty to defend." The court therefore found that Federated had a duty to defend, and to pay all defense costs that Jostens had incurred after December 20, 1995, when Jostens had tendered defense of the "suit." The court defined defense costs as those fees that are "reasonable and necessary to reduce or minimize the eventual liability for damages to the State of Illinois and to Springwood, including experts and consultants engaged in investigation, feasibility studies, and working with government officials and the public."

In July 1999, following joinder of Wausau, Federated moved the district court to certify the following two questions as "important and doubtful" pursuant to Minn. R. Civ.App. P. 103.03(h):

1. Whether the May 3, 1995 letter from a U.S. EPA contractor notifying Jostens of a site investigation, in conjunction with the ATEC report revealing off-site contamination, and Springwood's * * * March 1995 assertions against Jostens of the obligations of a "responsible party" to fully investigate the site and study remediation options in conformance with the IEPA procedures is tantamount to a suit, triggering a duty to defend.

2. Whether the duty to defend includes paying for all costs and fees, which Jostens has incurred since December 20, 1995, which are reasonable and necessary to reduce or minimize the eventual liability for damages to the State of Illinois and to Springwood, including experts and consultants engaged in investigation, feasibility studies, and working with government officials and the public.

For convenience, we will refer to the first issue as the "suit" issue, and the second issue as the "defense costs" issue.

The district court granted Federated's motion, finding both issues to be doubtful because there is no controlling precedent. The court then cited this court's decision in *Emme v. C.O.M.B., Inc.*, 418 N.W.2d 176 (Minn.1988), as providing a balancing test for determining whether issues are "important" under Rule 103.03(h). Because the district court found that the questions had "statewide impact," were important to the resolution of the case, provided a "major impediment to settlement," and that their resolution would expedite resolution of the action, the court determined that the questions were "important" under *Emme.*

Federated filed notice of appeal with the court of appeals on the certified questions. By an order filed September 1, 1999, the court of appeals concluded that under

*Emme* an appeal from a denial of summary judgment is premature if reversal of the certified questions will not terminate the action. As a result, the court held Federated's appeal improper. Following a motion by Federated to reinstate its appeal, the court of appeals, by an order dated September 28, 1999, reiterated its earlier order.

## I.

◼ On appeal to this court, Federated argues that the court of appeals misapplied *Emme* because *Emme* does not hold that termination of the proceedings is a prerequisite for an issue to be "important" under Rule 103.03. Federated argues that whether reversal will terminate the proceedings is a factor that must be considered as part of a balancing test, but is not itself determinative. This issue raises a legal question that requires construction of a procedural rule, which we review de novo. *See State v. Nerz*, 587 N.W.2d 23, 24–25 (Minn.1998).

◼ Minnesota Rule of Civil Appellate Procedure 103.03(h) provides that an appeal may be taken to the court of appeals "if the trial court certifies that the question presented is important and doubtful, from an order which * * * denies a motion for summary judgment." Rule 103.03(h) provides a mechanism for interlocutory appeals, because without certification the denial of a summary judgment motion would not ordinarily be appealable until the end of the proceedings.

◼ We addressed this certification process in *Emme*. In *Emme* we considered whether a question had been properly certified as "important and doubtful" in a products liability action involving a child who sustained an eye injury while playing a dart game. *See id.* at 178. In addressing the certification, we began by noting that the general policy behind the appellate rules is to avoid piecemeal litigation, conserve judicial resources, and expedite

trial proceedings. *See id.* at 179. We then provided a general overview of Rule 103.03 by stating that "[i]f granting the motion results in an adjudication of fewer than all the claims or the rights and liabilities of fewer than all the parties, appeal must ordinarily await the entry of a judgment which adjudicates all remaining claims and the rights and liabilities of all remaining parties." *Emme*, 418 N.W.2d at 179. We further stated that "certification of the question does not convert the order into an order appealable pursuant to Rule 103.03(h) * * *, but only frustrates the policy of the rule: *appeal would delay the trial, but reversal would not obviate it.*" *Id.* (emphasis added).

Jostens argues that with these statements *Emme* established that a question may not properly be certified under Rule 103.03(h) unless its reversal will terminate the proceedings. Jostens' reading overstates the meaning of the language. The language on which Jostens relies is contained in a paragraph that reviews the balance between the policy against piecemeal appeals and the recognized exceptions where judicial economy or other interests justify allowing an interlocutory appeal and how those competing interests are reflected in the operation of Rule 103.03(h). In *Emme*, we pointed out that the benefit of judicial economy is less readily achieved when only some of the issues in the case are decided by the district court and certified for interlocutory appeal because reversal will not terminate the proceedings. *Emme*, 418 N.W.2d at 179.

This language does not make potential to terminate the proceedings a prerequisite to certification as an important issue. Rather, viewed in the context of the entire opinion, the paragraph is more accurately understood as a caution that without the potential for termination of proceedings the rationale that justifies this exception to the policy against piecemeal appeals is di-

minished.[1] The consequence of this cautionary note is not that certification of issues is prohibited absent potential for complete termination of the proceedings, but rather that the potential to terminate or significantly reduce further proceedings should be a primary factor in the balancing test we then enunciated in *Emme*. For these reasons, we conclude that the court of appeals misinterpreted *Emme* when it held that certification under Rule 103.03(h) is improper if reversal would not terminate the proceedings entirely.

▮ Following this cautionary discussion, *Emme* provides factors to consider in determining whether a question is "important." *See id.* at 180. A question is increasingly important if: (1) it will have statewide impact, (2) it is likely to be reversed, (3) it will terminate lengthy proceedings, and (4) the harm inflicted on the parties by a wrong ruling by the district court is substantial. *See id.* Conversely, the question is decreasingly important if: (1) it is likely to be affirmed, (2) it is likely that trial will moot the issue, (3) reversal of the question will not terminate the action, and (4) reversal of the question will not relieve the parties of any significant burden. *See id.*

▮ While *Emme* provides this balancing test to determine whether a question is properly certified as "important," each of the factors of that test does not necessarily warrant equal consideration. Specifically, a great deal of importance should be placed on whether reversal of the question will terminate the proceedings.[2] This is consistent with the general policy against piecemeal litigation, which we emphasized in *Emme*. The fact that reversal will not terminate the proceedings is not in and of itself determinative of whether the question is "important." However, if reversal will not terminate the proceedings, we will require that a district court, in certifying the question, make specific findings as to how the interlocutory appeal will materially advance the ultimate termination of litigation and avoid protracted or expensive litigation.

Such findings are not present in the record before us. Therefore, if the questions are otherwise properly certified, we will remand for such findings. However, such remand is only necessary if the questions also meet the "doubtful" prong of Rule 103.03(h). In the interests of judicial economy, we will next address that aspect of the certification.

## II.

▮ A question is properly certified as doubtful if there is no controlling precedent. *See Emme*, 418 N.W.2d at 179.

---

1. We would be remiss if we did not also acknowledge that the discussion in *Emme* is based in part on a misconception about the validity of motions for partial dismissal or partial summary judgment. We stated in a footnote: "It may be observed that neither the Rules of Civil Procedure nor the Rules of Civil Appellate Procedure recognize a motion for 'partial summary judgment.'" *Id.* at n. 1. But in fact Minn. R. Civ. P. 56.01 authorizes a party seeking to recover on a claim to "move * * * for a summary judgment in the party's favor upon all or *any part thereof.*" (Emphasis added.)

2. In support of the balancing test in *Emme*, we cited a federal practice treatise that examines 28 U.S.C. § 1292, which is the corollary federal procedural provision to Rule 103.03. Section 1292(b), which relates to interlocutory decisions, provides that the court may

render an otherwise nonappealable interlocutory order appealable if it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may *materially advance the ultimate termination of the litigation * * *.*" 28 U.S.C. § 1292(b) (1998) (emphasis added). Courts interpreting this statute have emphasized that it should be used sparingly, and only where intermediate appeal may "avoid protracted or expensive litigation." *See, e.g., Kroch v. Texas Co.*, 167 F.Supp. 947, 949 (D.C.N.Y.1958) (quoting *Milbert v. Bison Laboratories, Inc.*, 260 F.2d 431, 433 (3d Cir.1958)). Thus, under the federal rule it is clear that while termination of the proceedings is not a threshold requirement for proper certification, it is an important factor.

"That the question is one of first impression is not, however, of itself sufficient to justify certification as doubtful; the question should be one on which there is substantial ground for a difference of opinion." *Id.* at 180.

## A. The "suit" issue

█ In this case, the district court certified as doubtful the question of whether, cumulatively, the following items were tantamount to a suit that would trigger the insurer's duty to defend: (1) the May 3, 1995, letter from the United States EPA contractor notifying Jostens of a site investigation, (2) the ATEC report revealing off-site contamination, and (3) Springwood's March 1995 assertion that Jostens was obligated, as a "responsible party," to fully investigate the site and study remediation options. Federated argues that there is no controlling precedent on this issue because this court has not addressed whether a combination of events may cumulatively constitute a suit.

We addressed what constitutes a "suit" in *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315 (Minn.1995). SCSC operated a facility that handled perchloroethylene (PCE). *See id.* at 308. When the Minnesota Pollution Control Agency (MPCA) found PCE contamination near the SCSC facility, it issued a Request for Information (RFI) asking SCSC to detail its PCE use. *See id.* at 309. Then, because SCSC indicated that PCE drippings had occurred at their facility, the MPCA required SCSC to develop remedial work plans to investigate and ameliorate PCE groundwater contamination. *See id.*

SCSC requested reimbursement for these cleanup costs from its general liability insurers, but the insurers denied coverage. *See id.* After the MPCA issued a Request for Response Action (RFRA) requiring SCSC to take specific remedial action, SCSC filed suit against its insurers seeking declaratory and compensatory relief. *See id.* at 309–10. The district court found in SCSC's favor.

On appeal, one of the insurers argued that the district court should be reversed because the RFI did not constitute a "suit" under the insurance policy. *See id.* at 315. In addressing that argument, we examined our decision in *Minnesota Mining & Mfg. v. Travelers Indem.*, 457 N.W.2d 175 (Minn.1990) (hereinafter *3M* ). There, we held that the term "damages" in a comprehensive general liability policy did not just refer to monetary compensation that insureds were obligated to pay for third party injuries. *See id.* at 178. Rather, the term "damages" also encompasses costs that the insured incurred while responding to state and federal agencies. *See id.* In *SCSC*, by analogy we applied this broad approach to the construction of the term "damages" to the interpretation of the term "suit." *See SCSC*, 536 N.W.2d at 315. More specifically, we stated that

[a]lthough we did not reach the related issue of what constitutes a "suit" under such a policy, it logically follows from both our analysis and our decision in *3M* that the term "suit," as used in a [comprehensive general liability] policy, includes actions taken by the [Minnesota EPA] in the form of an RFI.

*Id.*

In support of our holding in *SCSC*, we cited two cases. *See id.* First, we cited *A.Y. McDonald Indus. v. Insurance Co. of N. Am.*, in which the Iowa Supreme Court cited our decision in *3M* and held that an EPA demand to clean up groundwater contamination constituted a "suit" under a comprehensive general liability policy. 475 N.W.2d 607, 626–29 (Iowa 1991). Next, we cited the Ninth Circuit Court of Appeals decision in *Aetna Cas. & Sur. Co. v. Pintlar Corp.*, which held that a "Potential Responsible Party" letter [3] issued by

---

**3.** [A] PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a [Comprehen-

the EPA constitutes a "suit" because an "ordinary person" would perceive such a letter as notice of the "effective commencement of a 'suit' necessitating a legal defense." 948 F.2d 1507, 1516–17 (9th Cir. 1991).

In light of the holding and analysis in *SCSC*, we conclude that *SCSC* provides sufficient guidance as to what constitutes a "suit" and that the requirement that there be "substantial ground for a difference of opinion" in order to properly certify a question as doubtful is not met. *See Emme*, 418 N.W.2d at 180. Accordingly, we hold that the district court improperly certified this issue as doubtful for the purposes of Rule 103.03(h).

1. The "defense costs" issue

██ The district court also certified as doubtful the question of whether Federated's duty to defend included paying all costs and fees reasonably necessary to reduce or minimize Jostens' eventual liability for damages to the State of Illinois and to Springwood. We addressed the extent to which incurred costs are defense costs in *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 738 (Minn.1997).

Domtar operated a refining plant that was closed in 1948 and sold in 1955. *See id.* at 728–29. In 1987, the MPCA found that Domtar was responsible for hazardous substances found in the soil and groundwater. *See id.* at 729. As a result, the MPCA issued a RFRA to Domtar. *See id.* Domtar estimated that its liability would be $7 million, but its general liability insurers denied coverage and refused to defend. *See id.* Domtar filed suit against the insurers and the district court found that the insurers had breached a duty to defend and therefore owed Domtar defense costs. *See id.* at 730.

On appeal, the insurer argued that the district court erred in concluding that investigation and compliance costs were defense costs and therefore not subject to policy deductibles or liability limits. *See id.* at 738. Instead, the insurer argued that such costs were required by the RFRA, were a necessary part of the remediation, and were therefore indemnity costs. *See id.* at 737–38. We affirmed the district court, stating that "the better approach is to allow an insured to receive as defense costs those expenses reasonably necessary *either* to defeat liability *or* to minimize the scope or magnitude of such liability." *Id* at 738. We further stated that this approach encourages insureds to clean up contaminated property "without fear that all investigation and compliance costs will thereafter be considered indemnity costs by default." *Id.* We concluded that while some defense costs may serve a dual purpose of complying with the RFRA, those costs are not necessarily indemnity costs. *See id.* Finally, because Domtar's investigation and compliance costs minimized "the potentially staggering scope and magnitude of its liability," we held that the district court properly classified them as defense costs. *See id.* at 739.

We conclude that *Domtar* provides a definition of "defense costs" sufficient to constitute "controlling precedent." *See Emme*, 418 N.W.2d at 179. We therefore hold that the district court improperly certified the "defense costs" issue as doubtful under Rule 103.03(h).[4]

Because we hold that the district court improperly certified both the "suit" and the "defense costs" issues as doubtful pursuant to Rule 103.03(h), we need not remand the case for specific findings in order to determine whether the questions were properly certified as important pursuant to

sive Environmental Response, Compensation, and Liability Act (CERCLA) ] case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process.

*Aetna*, 948 F.2d at 1516–17 (citation omitted).

4. Our decision today should not be construed as deciding either the "suit" or the "defense costs" issues.

Rule 103.03(h). Therefore, we affirm the result of the court of appeals and remand this matter to the district court for further action consistent with this opinion.

Affirmed and remanded for further proceedings.