**Greg SIEWERT, et al., Respondents,**

v.

**NORTHERN STATES POWER COMPANY, d/b/a Xcel Energy, Appellant.**

**Nos. A07–1975, A07–2070.**

Court of Appeals of Minnesota.

Dec. 9, 2008.

---

Charles A. Bird, Bird, Jacobsen & Stevens, P.C., William D. Mahler, Will Mahler Law Firm, Rochester, MN, for respondents.

Timothy R. Thornton, Kevin M. Decker, Briggs and Morgan P.A., Minneapolis, MN, for appellant.

Considered and decided by
CONNOLLY, Presiding Judge;
LANSING, Judge; and MINGE, Judge.

## OPINION

LANSING, Judge.

The district court denied Northern States Power's (NSP) motion for summary judgment on Harlan Siewert and Greg Siewert's common-law claims alleging damages and requesting injunctive relief from the effects of stray voltage on their dairy cows. Following NSP's initial appeal from the denial of summary judgment, the district court certified, as important and doubtful, questions on whether the Siewerts' action is barred by the filed-rate doctrine, the primary-jurisdiction doctrine, or the statute of repose for improvements to real property. We conclude that neither the filed-rate nor the primary-jurisdiction doctrine bars the Siewerts' claims for damages, but that the filed-rate doctrine bars their request for injunctive relief. We also conclude that none of the six claims is barred by the statute of repose, but our determination relies, in part, on an analysis that differs from that of the district court. Therefore, we answer the certified questions in the negative, affirm the district court as modified on the damages claims, reverse on the injunctive-relief claims, and remand for trial on the merits.

## FACTS

Harlan Siewert and Greg Siewert are dairy farmers in Wabasha County. When they moved to their farm in 1989, they owned between 150 and 200 cows. Following their 1989 move, milk production did not meet expectations. The Siewerts assert that in the late nineties the milk production unexpectedly flattened, and then began to decrease in the early part of the current decade. During the years of unusually low production, the dairy herd also experienced more health problems than usual, and the Siewerts' veterinarians were unable to provide a satisfactory explanation for the problems.

The Siewerts' Wabasha County farm property was connected to the electrical grid in 1960 or shortly thereafter. The distribution line runs from the Zumbro Falls substation past the Siewerts' farm, and the electrical service to the farm is tapped in at the end of the driveway. The first major change that NSP made to the configuration of the electrical supply and grounding came in the eighties. A transformer pole was relocated on the property about the time of the Siewerts' move in 1989. In 1996 NSP added a new transformer and pole to the farm to extend service to a mobile home. And in 1999 NSP moved another utility pole on the farm. Over the same period, aggregate demand on the Zumbro Falls substation grew. The record indicates that part of the increase resulted from NSP's need to supply customers beyond the Siewerts' farm on the same distribution line.

In 2004 the Siewerts began to explore whether stray voltage might be the cause of their dairy herd's poor milk production. Stray voltage is a phenomenon in which voltage returning to the ground after powering an appliance is able to pass through an object not intended as a conductor. In March 2004 the Siewerts hired an electrician to test for stray voltage in the area of the dairy operation. Shortly before the testing, NSP responded to the Siewerts' concerns by installing a neutral isolator on the farm. The electrician's measurements at that time showed "[c]ow contact voltages exceeding 1.5 volts." The electrician described this voltage as excessive. NSP's engineer then designed a new three-phase configuration for electrical service to the farm, including a primary neutral isolator that had greater capacity. The engineer

stated at a deposition that he took this action because he concluded that, at some time after 1989, the existing transformer bank had become overloaded. Greg Siewert testified at a deposition that the June 2004 reconfiguration caused the voltage to drop. He also stated that during one brief period the Siewerts powered their farm with a separate generator, and the voltage measurement dropped further.

The Siewerts sued NSP in June 2004, alleging that the stray voltage had in fact been the source of losses in their dairy production. They filed an amended complaint in March 2007, alleging that NSP caused the stray voltage and pleading seven grounds for their requested injunctive and compensatory relief. The grounds included trespass, nuisance, strict liability, and common-law negligence.

Between June 2004 and July 2007, the Siewerts and NSP conducted discovery, and, in July 2007, both moved for summary judgment. As relevant to this appeal, the district court rejected NSP's arguments that the Siewerts' claims are barred by the filed-rate doctrine, the primary-jurisdiction doctrine, and the statute of repose for improvements to real property, and denied summary judgment. NSP initially raised these three issues in a direct appeal based on a claim of right and also filed a petition for discretionary review. While these matters were pending, the district court certified for review the same three questions, making the order denying summary judgment appealable under Minn. R. Civ.App. P. 103.03(i). The petition for discretionary review was denied, and the appeal based on a claim of right was consolidated for decision with this appeal because it raised the same three issues as the certified questions.

## ISSUES

I. Are the questions properly certified as important and doubtful?

II. Does the filed-rate doctrine bar the district court from considering the Siewerts' claims?

III. Does the primary-jurisdiction doctrine bar the district court from considering the Siewerts' claims without first referring them to the Minnesota Public Utilities Commission?

IV. Are the Siewerts' claims barred by the statute of repose for improvements to real property set forth in Minn.Stat. § 541.051?

## ANALYSIS

### I

The district court may, as an exception to the general rule of finality, certify to the court of appeals an order denying a motion for summary judgment if the question presented is important and doubtful. Minn. R. Civ.App. P. 103.03(i). We independently review whether a question is important and doubtful. *See Emme v. C.O.M.B., Inc.,* 418 N.W.2d 176, 180–81 (Minn.1988) (applying de novo review to determine whether question is important and doubtful).

To be doubtful, a question need not be one of first impression, but "it should be one on which there is a substantial ground for a difference of opinion." *Fedziuk v. Comm'r of Pub. Safety,* 696 N.W.2d 340, 344 (Minn.2005). A question is important if it has statewide impact, will likely be reversed, is dispositive of potentially lengthy proceedings, and will impose substantial harm if wrongly decided by the district court. *Jostens, Inc. v. Federated Mut. Ins. Co.,* 612 N.W.2d 878, 884 (Minn. 2000). Among these factors, significant weight attaches to whether reversal would

terminate potentially lengthy proceedings. *Id.*

In evaluating whether the district court's three certified questions are important and doubtful, we must also ensure that "the issue set forth in the certified question accurately reflects the record." *Prof'l Fiduciary, Inc. v. Silverman,* 713 N.W.2d 67, 70 (Minn.App.2006), *review denied* (Minn. July 19, 2006). The crux of each question is whether the given rule— the filed-rate doctrine, the primary-jurisdiction doctrine, or the statute of repose— bars the Siewerts' claims. In restructuring the questions in the statement of the issues, we have restricted the questions to their summary-judgment context and avoided adversarial characterizations that would enlarge the questions beyond this stage of the litigation.

█ We first address whether the three issues presented are doubtful. Whether the filed-rate doctrine bars the claims essentially raises an issue on the scope of the filed-rate doctrine. This issue is not well settled, and less than eight months ago we recognized as doubtful the issue of whether the filed-rate doctrine applied to an alleged breach of NSP's contractual obligation to maintain points of connection between its wires and its customers' homes. *See Hoffman v. N. States Power Co.,* 743 N.W.2d 751, 754 (Minn.App.2008) (deciding that certification was proper for filed-rate question in suit against NSP), *review granted* (Minn. Apr. 15, 2008). Despite *Hoffman,* the scope of the filed-rate doctrine remains doubtful because the supreme court has granted review and has the case under consideration and because the cause of action in *Hoffman* is based on contract, which is distinct from the Siewerts' tort claims.

█ We also conclude that the primary-jurisdiction question is doubtful. Although the district court certified a primary-juris-diction question in *Hoffman,* it was unnecessary to address this question on appeal because the filed-rate doctrine was determined to be dispositive. *Id.* at 753. Thus, even on *Hoffman's* contract claim, direct precedent is not available on whether NSP's maintenance obligation is within the special competence of the Minnesota Public Utilities Commission (MPUC) or is, instead, inherently judicial. *See City of Rochester v. People's Coop. Power Ass'n, Inc.,* 483 N.W.2d 477, 480 (Minn.1992) (explaining primary-jurisdiction doctrine). Due to the lack of precedent and the absence of a primary-jurisdiction analysis in *Hoffman,* the scope of the primary-jurisdiction doctrine remains doubtful.

█ Similarly, the question of whether the Siewerts' claims are barred by the statute of repose is doubtful. *See* Minn. Stat. § 541.051 (setting forth statute of repose). To support their argument that their claims are not barred, the Siewarts rely, in major part, on our decision in *Johnson v. Steele–Waseca Coop. Elec.,* 469 N.W.2d 517 (Minn.App.1991), *review denied* (Minn. July 24, 1991). Two years ago, in *State Farm Fire & Cas. v. Aquila Inc.,* 718 N.W.2d 879 (Minn.2006), the supreme court observed that its holding could call into question the continuing viability of *Johnson* but left that question "for another day." *Aquila,* 718 N.W.2d at 885 n. 1. Because the Siewerts' cause of action is similar to that in *Johnson,* a substantial ground for difference of opinion exists on this issue.

Turning to the remaining certification factor—whether the questions are important—we conclude that they are. As in *Hoffman,* "certification could terminate potentially lengthy proceedings." 743 N.W.2d at 754. Unlike *Hoffman,* the Siewerts' litigation is not a potential class-action suit. *Id.* But the questions nonethe-

less have a statewide effect on dairy farming and our largest supplier of energy. More generally, resolution of these issues may influence the way in which conflicts are settled between utilities and their customers and thus could have a substantial impact on NSP if wrongly decided. The last component of importance—the likelihood of reversal—is also present in these questions for all of the same reasons that we concluded the questions were doubtful. Based on the potential to end the suit, statewide impact, possible harm, and likelihood of reversal, we conclude that all three questions are important and doubtful.

## II

We address, first, the question of whether the Siewerts' cause of action is barred by the filed-rate doctrine. To answer that question we must examine the relationship between the Siewerts' claims and NSP's filed rate.

In Minnesota, as elsewhere, the legislature has established a comprehensive structure for regulating utilities and has delegated to an administrative body, the MPUC, the authority for enforcing these regulations. Minn.Stat. §§ 216B.01–.82 (2006). The statute requires each public utility to file public documents on the details of its operations. Minn.Stat. § 216B.05. A public utility must file schedules showing "rates, tolls, tariffs, or charges ... for any service performed...." *Id.*, subd. 1. It must file "all rules that ... in any manner affect the service or product." *Id.*, subd. 2. It must also file for approval any contracts for electric service "in which the public utility and the customer agree to customer-specific rates, terms, or service conditions not already contained in the approved schedules, tariffs, or rules of the utility." *Id.*, subd. 2(a). These filings are commonly referred to collectively as the utility's "tariff." The purposes of regulating the utility providers are "to provide the retail consumers ... with adequate and reliable services at reasonable rates, consistent with the financial and economic requirements of public utilities ..., to avoid unnecessary duplication of facilities ... [,] and to minimize disputes between public utilities." Minn.Stat. § 216B.01.

The filed-rate doctrine, as applied to utilities, is a common-law rule whereby a court declines to decide a dispute between a public utility and its consumers because of the regulatory mandate that controls the utility. *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 317 (Minn.2006) (adopting filed-rate doctrine in Minnesota). Three principles support the doctrine's rationale. First, the terms filed by the utility—the schedules, rules, and contracts—are inextricably linked with the service that the documentation establishes and, consequently, a dispute that involves "services" is arguably a dispute about rates charged, the applicable rules, or a governing contract. *AT & T Co. v. Cent. Office Tel. Inc.*, 524 U.S. 214, 223, 118 S.Ct. 1956, 1963, 141 L.Ed.2d 222 (1998). Second, because the legislature has given the MPUC broad responsibility for the aggregate economic impact of utilities, the MPUC must also have the power to manage, decide, and enforce utility services. *Schermer*, 721 N.W.2d at 314. Third, consumers and utilities alike may not turn to courts to settle disputes over services because courts have neither the capacity nor the authority to reallocate the economic and policy considerations implicated by a single dispute. *Id.*, at 315.

We start from the fundamental fact that no specific schedule, rule, or contract under NSP's tariff is directly at issue in this dispute. NSP's filed schedules are not based on any specific obligation with respect to stray voltage; the tariff does

not have a rule addressing stray voltage; and no contractual agreement exists between NSP and the Siewerts to keep stray voltage at a certain level. This is, instead, a dispute more generally about NSP's services and the effects of these services. Nevertheless, NSP maintains that the Siewerts' claims are barred because the claims necessarily require a conclusion that NSP provided inadequate service in the past or that it must provide a greater degree of service in the future. The filed-rate doctrine rests squarely on the principle that the scope of service cannot be directed by a court and must be left to the MPUC. *AT & T Co.*, 524 U.S. at 223, 118 S.Ct. at 1963. Thus, the Siewerts' claims for relief are barred by the filed-rate doctrine if granting the relief would result in the court directing the scope of the service to be provided.

As relevant to the Siewerts' claims, "service" is defined as "the installation, removal, or repair of equipment or facilities for delivering or measuring such gas and electricity." Minn.Stat. § 216B.02, subd. 6. Our analysis therefore centers on whether granting the types of relief requested by the Siewerts—injunctive relief and compensatory damages—would result in the court directing "the installation, removal, or repair of equipment or facilities." *Id.*

We agree with NSP that granting the Siewerts' claims for injunctive relief would result in the court directing the scope of the service to be provided. The complaint's prayer for injunctive relief states:

> [The Siewerts] demand judgment ... [for] injunctive, mandamus or other relief compelling [NSP] to cease trespass and nuisance in the form of stray current over and through the property of [the Siewerts] and/or an order compelling [NSP] to reconstruct the distribution lines to reduce or eliminate stray current.

Ostensibly, the prayer for relief calls on the court to compel NSP to "reconstruct the distribution lines to reduce or eliminate stray voltage," which would necessarily amount to "installation, removal, or repair of equipment or facilities." *Id.* The unmistakable implication of this claim is that either NSP was previously required by the tariff to provide this service or should provide it in the future. Even if it were within the court's competency to engineer an appropriate electrical solution to the problem, the legislature has specifically delegated to the MPUC the responsibility to make these practical and policy determinations. *See Hoffman*, 743 N.W.2d at 756 (holding that MPUC, "the agency charged by statute with approving rates," was in best position to determine if NSP was required to maintain or repair components at issue). Thus the Siewerts' claims for injunctive relief are barred by the filed-rate doctrine.

■ We reach the opposite conclusion on the Siewerts' claims for compensatory damages. No reading of the statutory definition of "service" suggests that paying damages is a "service." A court that orders the payment of damages is not interpreting the tariff to require a past or future service.

■ We recognize that paying damages would, of course, financially affect NSP and could, for that reason, indirectly affect future rates. Damages for negligent actions are generally considered a cost of doing business, similar to the acquisition of materials and supplies or other expenses. *See Lange v. Nat'l Biscuit Co.*, 297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973) (noting that vicarious tort liability is based on notion that companies can absorb this liability as business cost); *see also Jones v. Schiek's Cafe*, 277 Minn. 273, 277, 152 N.W.2d 356, 359 (1967) (referring to burden on employers under workers' com-

pensation statutes to compensate for workplace injuries as "a proportionate part of the expense of production"). When the MPUC determines rates or rate changes, these costs are presumably part of what it accounts for in considering the "financial and economic requirements" of NSP. Minn.Stat. §. 216B.01.

It is possible, of course, that the burden of damages from tort claims could be limited and borne equally by utilities and consumers in the aggregate. *See D.W. Hutt Consultants, Inc. v. Constr. Maint. Sys., Inc.,* 526 N.W.2d 62, 65 (Minn.App.1995) (stating that purpose of workers' compensation law was, in part, to "shift economic loss to industry and the public"). In addressing the problem of workplace injuries, for example, the legislature abrogated common-law remedies and replaced those remedies with exclusive recourse to an administrative body. *See* Minn.Stat. § 176.001 (2006) (stating that "workers' compensation system in Minnesota is based on a mutual renunciation of common-law rights and defenses by employers and employees alike"). The Minnesota Workers' Compensation Act illustrates the method by which the legislature has removed a class of claims from the courts. *See* Minn.Stat. §§ 176.271–176.411 (2006) (establishing administrative procedure by which employees may seek compensation for injuries). Although Minnesota has not, some jurisdictions have taken a similar approach with regulations addressing stray voltage, providing for remediation but establishing limitations on actions for civil damages. *See, e.g.,* Idaho Code Ann. § 61–807 (Supp. 2008) (requiring dairy producers to allow utility opportunity to address stray voltage before filing action for damages). A court, however, will not conclude that the legislature has eliminated common-law remedies unless it does so unmistakably.

*See Urban v. Am. Legion Dep't of Minn.,* 723 N.W.2d 1, 10 (Minn.2006) (stating that "we presume that the legislature does not abrogate the common law unless it does so expressly or by necessary implication"); *see also Minn. Equal Access Network Servs. v. Burlington N. & Santa Fe R.R.,* 646 N.W.2d 911, 914 (Minn.App.2002) (holding that specific remedy offered under statute regulating excavators did not replace common-law remedies), *review denied* (Minn. Oct. 15, 2002).

The statutes regulating utilities in Minnesota are devoid of any indication that common-law torts against utilities have been replaced or abolished. Minn. Stat. §§ 216A.01–216A.095 (2006) (designating regulators); Minn.Stat. §§ 216B.01–216B.82 (setting forth regulations). In fact, the statutory language suggests otherwise. Significantly, the legislature has only granted the MPUC the authority to adjudicate violations of those laws and rules "administered by the [d]epartment of [c]ommerce." Minn.Stat. § 216A.05. The department of commerce does not administer the common law of torts. Any authority that the legislature provided to the MPUC in conjunction with common-law causes is circumscribed and explicit. For example, Minn.Stat. § 216B.48, subd. 6, grants the MPUC power to supervise contracts "so far as necessary to protect and promote the public interest." There is one provision that creates a liability limit for a utility's use of products designed to promote energy-conservation. Minn.Stat. § 216B.241, subd. 3. But this shield does not extend to negligence in the utility's "purchase, installation, or modification" of energy-conservation products. *Id.* This specific limitation on tort liability tends to negate an inference that the filed-rate doctrine bars common-law-tort actions. We are cognizant that in one case we validated a narrow limitation on tort liability that the MPUC

included in an NSP tariff. *Computer Tool & Eng'g, Inc. v. N. States Power Co.*, 453 N.W.2d 569, 573 (Minn.App.1990), *review denied* (Minn. May 23, 1990). But part of our basis for concluding that the limitation did not violate public policy was that it left intact NSP's liability for all other kinds of injury. *Id.*

The Minnesota legislature has not plainly altered a person's right to bring a common-law-tort claim against a utility, and it is not appropriate for the judiciary to undertake an alteration of this magnitude under the guise of interpretation. Courts in Minnesota have long heard cases alleging injuries by a utility, and we find no basis for curtailing that division of authority. *See, e.g., Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856, 864 (Minn.1984) (reversing for failure to give res ipsa instruction in negligence case involving gas leak); *Steinbrecher v. McLeod Coop. Power Ass'n*, 392 N.W.2d 709, 712 (Minn.App. 1986) (holding that, in wrongful-death action against electricity provider, negligence issues were for jury).

In summary, we conclude that the filed-rate doctrine does not bar the Siewerts from seeking damages based on common-law-tort claims. But the filed-rate doctrine does bar their request for injunctive relief because it would defeat the legislature's delegation of power to the MPUC.

### III

The second certified question is whether the primary-jurisdiction doctrine bars judicial consideration of the Siewerts' claims without first referring them to the MPUC. Because we have concluded that the filed-rate doctrine bars the Siewerts from seeking injunctive relief, we consider this question only with respect to the remaining remedy: compensatory damages for common-law torts. The answer turns directly on the respective competencies of the judicial and administrative branches of government.

In a case specific to public utilities, the Minnesota Supreme Court discussed primary jurisdiction:

> Its application promotes proper relationships between the courts and administrative agencies ... and it is used whenever enforcement of the claim requires the resolution of issues which ... have been placed within the special competence of an administrative body. [It] ensures, first, that agencies are not passed over in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, and then, that uniformity and consistency result. The doctrine is inapplicable if the issues raised are inherently judicial, unless the legislature has explicitly granted exclusive jurisdiction to the administrative body.

*City of Rochester*, 483 N.W.2d at 480 (citations and quotations omitted).

Under the criteria identified in *City of Rochester*, we evaluate whether the Siewerts' claims require the resolution of issues that have been "placed within the special competence of" the MPUC and whether the issues are "inherently judicial." *Id.* We conclude that the issues presented here have not been placed within the special competence of the MPUC for three reasons.

First, the MPUC does not have the capacity to address the Siewerts' claims for compensatory damages in tort, because nowhere in the enabling statutes does the legislature give it authority to provide this type of damages. *See* Minn.Stat. 216A.05, subd. 2 (defining powers vested in MPUC); *see also Minnegasco v. Minn. Pub. Utils. Comm'n*, 549 N.W.2d 904, 907 (Minn.1996) (stating that MPUC is "creature of stat-

ute" and has no authority beyond what legislature has given it). Likewise, the legislature has not directed the MPUC to establish any standards related to stray voltage, its remediation, or its costs. *Cf.* Idaho Code Ann. §§ 61–801 to 61–809 (Supp.2008) (directing state utility commission to establish protocol and procedures for measuring stray voltage, identifying its sources, remediating excessive levels, and addressing complaints).

Second, even acknowledging the relative complexity of electrical-distribution systems, resolving the issues of fact presented by the Siewerts is not beyond "the conventional experience of judges." *City of Rochester,* 483 N.W.2d at 480. The litigants' expert witnesses will provide sufficient factual information. Minn. R. Evid. 702 (permitting testimony by expert witnesses).

And, third, the resolution of fact issues underlying the Siewerts' claims does not require "the exercise of administrative discretion" or create an administrative need for "uniformity and consistency." *City of Rochester,* 483 N.W.2d at 480. Deciding whether specific facts meet the elements of a tort claim is not uniquely suited to an administrative agency, but instead is regularly decided by juries. *See Steinbrecher,* 392 N.W.2d at 712 (holding that, in wrongful-death action, question of appropriate precautions was one for jury). The claims do not turn on a safety standard that requires definitive uniformity. *Id.* The common-law principles underlying resolution of negligence actions will provide the necessary uniformity and consistency.

We also conclude that the Siewerts' claims are inherently judicial. The Siewerts' cause of action arises under the common law of torts. The judiciary retains the necessary institutional competence for deciding tort claims, and the legislature has not granted exclusive jurisdiction to an administrative authority.

The district court is therefore not barred by primary jurisdiction from hearing and deciding the Siewerts' claims for compensatory damages.

## IV

■ The third certified question is whether the Siewerts' claims are barred by the statute of repose for an improvement to real property as set forth in Minn.Stat. § 541.051. The answer to this question turns on the meaning and application of "improvement to real property" under section 541.051, sub. 1(a).

As relevant to this appeal, section 541.051 imposes a statute of repose for tort actions "arising out of the defective and unsafe condition of an improvement to real property." *Id.* This definition includes actions brought against the owner of the real property or against "any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction" of the designated improvement. *Id.* The repose provision establishes that no cause of action will be recognized unless the harm complained of is discovered within ten years after "substantial completion" of the improvement. *Id.; see also id.,* subd. 2 (providing that, for injuries discovered in last two years of ten-year period, plaintiff must file suit two years after discovery of injury, up to total of twelve years after substantial completion). Even if a claim is not barred by the statute of repose, it must still be brought within two years after discovery of the injury. *Id.,* subd. 1(a).

■ The phrase "improvement to real property" in section 541.051 is defined with a "common-sense" application of its dictionary meaning. *Pac. Indem. Co. v. Thompson–Yaeger, Inc.,* 260 N.W.2d 548, 554

(Minn.1977). Thus, an improvement to real property is "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Id.* Reliance on this definition emphasizes its key factors of expenditure, permanence, increase in the property's value, and alternation beyond ordinary repair. *Aquila,* 718 N.W.2d at 884.

In 1991, we held that a farmer's stray-voltage claims against a utility were not affected by section 541.051 because the utility's system for distributing electricity to the farm was not an improvement to real property. *Johnson,* 469 N.W.2d at 520. *Johnson* relied on two of the factors in *Pacific Indemnity*'s common-sense definition. The first factor was permanence. *See Johnson,* 469 N.W.2d at 519 (distinguishing between "installations" added to farm's buildings and "pendent" equipment NSP used "to distribute electric power"). The distinction we drew under the permanence factor is analogous to the difference between mail delivery and a mailbox. Constructing a mailbox, digging a hole, and securing the mailbox in the ground is an "improvement to real property," but it will not provide a grant of repose to a mail carrier who negligently tramples across the lawn and destroys an expensive area of landscaping fifteen years later. Unlike the postal service that is limited to the delivery of service, NSP both delivers the service and erects the structures that make the delivery of service possible. The question thus turns on whether the claim for damages arises from the construction that allows for the service or the service itself. A complaint based on allegations that a given utility pole is defective or improperly installed implicates an improvement to real property. *See Lietz v. N. States Power Co.,* 718 N.W.2d 865, 869–71 (Minn.2006)

(addressing defectively installed anchor for pole). But if the claim, as in *Johnson,* is not that a pole or a conductor was improperly installed, but simply that return voltage in the system has a deleterious effect, the construction of the pole—the "improvement" itself—is not implicated. The claim is instead that the service itself is being harmfully delivered.

The second *Pacific Indemnity* factor incorporated into the *Johnson* analysis is the distinction between repairs and capital improvements. *See Pac. Indem. Co.,* 260 N.W.2d at 554 (distinguishing capital improvements from ordinary repairs). Because a delivery system on the whole is routinely subject to modification or expansion, these changes are considered repairs to the ongoing service, and not capital improvements for the property owner. *See Johnson,* 469 N.W.2d at 519 (noting that alleged improvements were designed to meet needs of cooperative distribution system); *see also Aquila,* 718 N.W.2d at 885 n. 1 (noting that claim in *Johnson* involved alleged improvements that "were part of a larger distribution system ... installed for the benefit of the power cooperative"). This idea underscores the distinction between erecting a structure and providing a service, and parallels *Pacific Indemnity*'s definition distinction between capital improvements and ordinary repairs.

Necessarily, the analysis in *Johnson* is of narrow applicability to the typical improvement to real property. *Aquila,* 718 N.W.2d at 885 n. 1. *Johnson* demonstrates that the statute of repose for improvements to real property is not easily applied to dual capacity construction/distribution providers and that repose may be inapplicable in the rare circumstances when the service itself, and not an individual component of an improvement, is alleged to be defective. 469 N.W.2d at 519. As applied,

a *Johnson*-type analysis depends on whether the claimant asserts that components were neither individually defective nor improperly installed, and that therefore the service, and only the service, is the defect. *See Aquila*, 718 N.W.2d at 885 n. 1 (distinguishing *Johnson* from claim based on gas line that had been defectively installed); *see also Johnson*, 469 N.W.2d at 520 (noting that "[the Johnsons] do not allege a defect in the electrical equipment attached to their farm buildings"). If a case is not based exclusively on fault in the way a service is provided, *Johnson* is "not helpful" in determining whether the claim involves an improvement to real property. *Aquila*, 718 N.W.2d at 885 n. 1.

Still, *Johnson* does not undermine or ignore the definition of "improvement to real property." It instead seeks to avoid too facile an application of the definition that would misconstrue the plaintiff's claim. Similarly, we are required to analyze whether the Siewerts' claims allege a defect in the service provided by the electrical-distribution system, as in *Johnson*, 469 N.W.2d at 519, or a more typical individual defect in an "improvement," such as a particular component or instance of construction, as in *Aquila*, 718 N.W.2d at 885 n. 1, or *Lietz*, 718 N.W.2d at 869.

The Siewerts' amended complaint alleges seven different claims. We note first that the trespass claim is moot, having already been dismissed by the district court. Four of the remaining six claims are based on negligence. They are:

 Negligence in handling, supplying, distributing, selling, and placing in the stream of commerce electrical power and electrical power distribution systems, equipment, and components

 Negligence in the construction and maintenance of defective and inadequate electrical power distribution systems, equipment, and components

 Negligence in failing to warn the Siewerts and others of the existence of, causes of, symptoms of, and risks and dangers of neutral to ground voltage

 Negligence in failing to adequately test and inspect systems, equipment, and components for said voltage

The fifth claim is based on strict-liability and alleges that defects existed "in electricity" when it left NSP's possession, making it "unreasonably dangerous and hazardous to farm property." The sixth and final claim is based on nuisance, asserting that NSP "distributed its electricity in a manner which produced a material annoyance, inconvenience and harm to [the Siewerts and their cattle]."

The Siewerts' strict-liability and nuisance claims most plainly implicate a service and not an individual improvement. They refer only to "electricity" as the cause of the harm, and they do not rely on factual allegations implicating any individually defective component or installation. They fall squarely within *Johnson*, because they rest on NSP's liability for the overall effect of delivering electricity. The failure-to-warn negligence claim is similar; it refers only to "neutral to ground voltage" as the cause. This falls within *Johnson* because an aspect of the service as a whole is alleged to be the source of the harm. Even under the strictest application of the *Pacific Indemnity* definition, neutral-to-ground voltage is not likely to be an improvement to real property because it is neither permanent nor valuable.

 The remaining three negligence claims appear to require more parsing to decide whether they are barred under *Johnson*, because on their surface they implicate both the electrical "system" as a whole and individual "equipment and components." The *Johnson* parsing is unnecessary, however, because the claims trig-

ger a statutory exception to the statute of repose that allows them to proceed whether or not they constitute an improvement to real property.

Under subdivision 1(d) of the repose statute, the time bars do not apply "to actions for damages resulting from negligence in the *maintenance, operation or inspection* of the real-property improvement against the owner or other person in possession." Minn.Stat. § 541.051, subd. 1(d) (emphasis added). The Siewerts' remaining three claims meet the two requirements of this exception.

First, the Siewerts' claims are against the owner of the "real-property improvement" because the components of the electrical-distribution system are owned by NSP. *See Johnson,* 469 N.W.2d at 519 (noting that electricity provider owned pendent equipment used to distribute electric power). Second, the Siewerts' claims are based on "maintenance, operation or inspection." Minn.Stat. § 541.051, subd. 1(d). The first negligence claim's reference to "handling, supplying, distributing, selling and placing in the stream of commerce" can reasonably be construed as implicating the "operation" of the electrical system and its components. It falls under the exception and is not barred. The negligence claim based on "failing to adequately test and inspect" plainly qualifies as one based on "inspection" and it is likewise excepted from the time bars. The remaining claim is based on "construction and maintenance." The *Johnson* distinction does not save a claim based on faulty construction of a component. But the exception for maintenance does save this claim to the extent that the Siewerts base it on "maintenance" of "power distribution systems."

NSP argues that, with respect to the claims that might fall under this exception, the Siewerts have not alleged facts suffi-

cient to establish the duty element of their negligence claims against NSP and therefore have failed to prove a statutory exception to the statute of repose. *See Aquila,* 718 N.W.2d at 886 (holding, in context of Minn.Stat. § 541.051 that burden of proving exception lies with party who seeks to claim benefit of exception). We conclude that the Siewerts have alleged facts sufficient to raise a triable issue.

Minnesota courts have long rejected the argument that a plaintiff must establish a regulatory or statutory violation to establish a duty element. *See Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11, 18 (Minn.1979) (explaining that industry cannot be permitted to set its own standard of care); *Muehlhauser v. Erickson,* 621 N.W.2d 24, 28 (Minn.App.2000) (holding that, to find negligence, jury need not find violation of federal motor-carrier regulation). Minnesota courts have also held that under certain circumstances the theory of res ipsa loquitor may be applied in negligence actions against utility companies. *Mahowald,* 344 N.W.2d at 862–63. The *Mahowald* court explained:

> In the ordinary course of events, natural gas does not escape from gas mains.... When it does ... an inference of fault on the part of the gas distribution company is justifiable. Even though the gas company may be faultless, in view of its superior knowledge of the gas distribution system, its access and opportunity to identify persons acting in the vicinity of the gas mains, its inspection and control over the mains, and its responsibility for the safety of the persons and property in the community, the gas company should have the obligation to show it was not negligent....

*Id.* at 863.

The Siewerts have provided sufficient facts to create a triable issue on the

question of whether NSP's control, alteration, maintenance, or inspection of the distribution system would, under the theory of res ipsa loquitor, require an inference of fault on its part. In the district court, the Siewerts submitted volumes of testimony by the parties, NSP employees, purported experts in the distribution of electricity, and others. They offered direct and circumstantial evidence that NSP breached a duty of care in providing electricity and caused the alleged damages.

Because three of the Siewerts' claims do not involve an improvement to real property under *Johnson*, and the other three are excepted from the statutory time bars under subdivision 1(d), none of the six claims is barred by the statute of repose.

### DECISION

The filed-rate doctrine does not bar the Siewerts' claim for damages but it does bar their claims for injunctive relief. The primary-jurisdiction doctrine does not require that the district court refer the certified questions to the MPUC. Finally, the Siewerts' claims are not barred by the statute of repose for improvements to real property.

**Affirmed in part, reversed in part, and remanded, certified questions answered in the negative.**