Greg **SIEWERT**, et al., Respondents,

v.

**NORTHERN STATES POWER COMPANY**, d/b/a Xcel Energy, Appellant.

Nos. A07–1975, A07–2070.

Supreme Court of Minnesota.

Jan. 26, 2011.

Charles A. Bird, Bird, Jacobsen & Stevens, P.C., Rochester, MN; and William D. Mahler, Will Mahler Law Firm, Rochester, MN, for respondents.

Timothy R. Thornton, Kevin M. Decker, Christianne A. Riopel, Briggs and Morgan, P.A., Minneapolis, MN, for appellant.

## OPINION

PAGE, Justice.

Respondents Greg and Harlan Siewert, doing business as Siewert Holsteins, sued appellant Northern States Power Compa-

ny (NSP) for damages and injunctive relief based on negligence, strict liability, trespass, and nuisance for stray voltage, which they claim was caused by an electric distribution system owned and operated by NSP. NSP moved for summary judgment on grounds that the filed rate doctrine, primary jurisdiction doctrine, and statute of repose precluded consideration of the Siewerts' claims. The district court largely denied NSP's motion for summary judgment, but certified these questions to the court of appeals as important and doubtful.[1] The court of appeals held that neither the filed rate doctrine nor the primary jurisdiction doctrine barred the Siewerts' claims for monetary damages, but the filed rate doctrine precluded consideration of the Siewerts' claims for injunctive relief. Additionally, the court of appeals held that the statute of repose did not bar any of the Siewerts' claims. We affirm the court of appeals with respect to the Siewerts' claims for monetary damages but reverse with respect to the Siewerts' claim for injunctive relief to prevent further nuisance by NSP.

Harlan Siewert and Greg Siewert, father and son, are dairy farmers. At the time they moved to their new farm in rural Wabasha County in 1989, they owned between 150 and 200 cows. Following their 1989 move, the cows' milk production decreased. Milk production seriously decreased by the late 1990s and early 2000s. The Siewerts' dairy herd also experienced health problems and unusually high mortality rates.

The Siewerts hired several experts to determine the cause of the decreased milk production and high mortality rates in the dairy herd. In 2004, at the recommendation of Dr. Andrew Johnson, a forensic veterinarian, the Siewerts began to explore stray voltage as the possible cause of the herd's losses. Stray voltage is a phenomenon in which an electrical current—voltage that returns to the ground after powering an appliance—passes through an object not intended as a conductor, in this case, allegedly the Siewerts' dairy cows.

The system that supplies electricity to the Siewerts and their neighbors is a multi-grounded wye system, a "system of conductors in which a neutral conductor is intentionally grounded solidly at specified intervals." National Electrical Safety Code (NESC) § 2 (IEEE 2006). A multi-grounded system may or may not be effectively grounded. *Id.* That is, a multi-grounded system may, or may not, have ground connections "of sufficiently low impedance and [ ] sufficient current-carrying capacity to limit the buildup of voltage to levels below that which may result in undue hazard to persons or to connected equipment." *Id.* The NESC recognizes several different electric distribution systems, including the multi-grounded wye system. NESC § 9-096.

In March 2004, the Siewerts hired an electrician to test for stray voltage in their farm's dairy operation area. The electrician found 6.6 amps of current and took measurements showing "[c]low contact voltages" exceeding 1.5 volts. The electrician concluded that this voltage was excessive. In the meantime, NSP responded to the Siewerts' concerns by designing a new three-phase configuration for electrical service to the farm, which included a primary neutral isolator with a greater capacity. During his deposition, Greg Siewert testified that following NSP's adjustments,

---

1. The district court granted NSP's motion for partial summary judgment dismissing the Siewerts' claim of trespass on grounds that the Siewerts had not shown that NSP had interfered with their right to exclusive possession of the property. The district court's ruling as to the Siewerts' trespass claim is not before us here.

the stray voltage began to drop but was not entirely eliminated.

The Siewerts filed a complaint against NSP in district court alleging negligence, strict liability, nuisance, and trespass, claiming that stray voltage was the source of losses in their dairy production. The Siewerts introduced expert testimony of Donald Zipse in support of their claims that: (1) an alternative to the multi-grounded system that provided the Siewerts with electricity, such as a uni-grounded system, would not have resulted in the harm the Siewerts experienced; and (2) better service procedures would also have alleviated the harm.

NSP moved for summary judgment, arguing in part that the filed rate doctrine, primary jurisdiction doctrine, and Minn. Stat. § 541.051 (2010), Minnesota's statute of repose, each barred the court's consideration of the Siewerts' claims. The district court rejected NSP's arguments and, except for the Siewerts' claim for trespass, denied summary judgment. NSP filed a direct appeal under a claim of right and also filed a petition for discretionary review under Minn. R. Civ.App. P. 105.01. Meanwhile, the district court certified the questions of the filed rate doctrine, primary jurisdiction doctrine, and statute of repose for review under Minn. R. Civ.App. P. 103.03(i). NSP's petition for discretionary review was denied, and the appeal based on claim of right and the district court's certification were consolidated for review by the court of appeals.

The court of appeals held that: (1) the filed rate doctrine barred consideration of the Siewerts' claims for injunctive relief but not their damages claims; (2) the primary jurisdiction doctrine did not bar the district court's consideration of the Siewerts' claims for damages because the claims are "inherently judicial"; and (3) the statute of repose did not preclude con-

sideration of the Siewerts' claims of negligence, strict liability, and nuisance because their claims either do not involve "improvement[s] to real property" or fall within the exception to the statute of repose for negligent maintenance, operation, or inspection of real property improvements. *Siewert v. N. States Power Co.*, 757 N.W.2d 909, 919, 920, 924 (Minn.App.2008). We granted NSP's petition for review.

## I.

■ We first address whether the filed rate doctrine precludes consideration of the Siewerts' claim for injunctive relief from nuisance and damages. This question and the questions on the primary jurisdiction doctrine and statute of repose came to the court of appeals as certified questions and therefore are questions of law that we review de novo. *Hoffman v. N. States Power Co.*, 764 N.W.2d 34, 42 (Minn.2009); *Watson ex rel. Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 411 (Minn.1996).

NSP is a regulated monopoly authorized to sell energy services in Minnesota. *Hoffman*, 764 N.W.2d at 39. As such, it is subject to regulation by the Minnesota Public Utilities Commission (MPUC). Minn.Stat. § 216B.08 (2010). The Legislature vested the MPUC with exclusive authority to "adopt standards for safety, reliability, and service quality for distribution utilities" like NSP. Minn.Stat. § 216B.029, subd. 1(a) (2010). NSP is required to file a tariff with the MPUC that specifies the rates at which it will provide electric distribution services. Minn.Stat. § 216B.05, subd. 1 (2010). NSP must also comply with regulatory and industry standards for "safety, design, construction, and operation of electric distribution facilities." Minn.Stat. § 216B.029, subd. 1(d) (2010). The MPUC enjoys broad power to ascertain and fix just and reasonable policies for

all public utilities. Minn.Stat. § 216B.029, subds. 1, 2 (2010). Moreover, "the MPUC must consider the right of the utility and its investors to a reasonable return, while at the same time establishing a rate for consumers which reflects the cost of service rendered plus a 'reasonable' profit for the utility." *N. States Power Co. v. Minn. Pub. Utils. Comm'n,* 344 N.W.2d 374, 378 (Minn.1984) (citing *Narragansett Electric Co. v. Burke,* 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978)). However, the power to award monetary damages to a complaining party is not one that the MPUC enjoys. *See Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n,* 369 N.W.2d 530, 534 (Minn.1985) (holding that the MPUC does not have statutory authority to order refunds of past revenue collections).

NSP argues that the Siewerts' claims are barred by the filed rate doctrine because: (1) a request for additional or alternative services provided by NSP goes to the reasonableness of NSP's tariff-specified services; and (2) the claims for injunctive relief and damages both improperly enlarge or vary tariff-specified services.

■ The filed rate doctrine is a judicially created doctrine that prevents courts from adjudicating private claims that would effectively vary or enlarge rates charged under a published tariff. *Keogh v. Chi. & Nw. Ry. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Courts apply the filed rate doctrine for three primary reasons. First, ratemaking is a legislative function delegated to government agencies; under separation-of-powers principles, courts should not second-guess the reasonableness or lawfulness of agency-approved rates. *Schermer v. State Farm Fire & Cas. Co.,* 721 N.W.2d 307, 314 (Minn.2006) (adopting the filed rate doctrine in Minnesota). Second, the regulation of rates is a comprehensive system and courts "ha[ve] neither the expertise nor the mechanisms to deal with the entire rate structure or the adequacy of the return to the regulated entity." *Id.* at 315. Third, courts hesitate to create discriminatory rate schedules by "retroactively reallocat[ing] rates among ratepayers, [which modifies] the rates for some ratepayers but not for others." *Id.* As we explained in *Peoples Natural Gas Co.,* "[p]ublic regulation of utility rates is an intricate, ongoing process. A reallocation of rates may set in motion an ever-widening set of consequences and adjustments...." 369 N.W.2d at 535; *see also Hoffman,* 764 N.W.2d at 42 ("Courts have recognized that the filed rate doctrine ... is grounded in ... non-discrimination principles.").

■ The filed rate doctrine bars both direct and indirect challenges to rates and the reasonableness of those rates. With respect to direct challenges to rates, in *Keogh* the U.S. Supreme Court confronted a claim by a manufacturer of excelsior and flax tow in St. Paul against interstate carriers that transported freight from St. Paul to locations in other states. 260 U.S. at 159, 43 S.Ct. 47. Through a committee created by the interstate carriers, uniform freight rates were established that, in effect, eliminated competition with respect to the rates and established rates higher than the rates the carriers had previously charged. *Id.* at 160, 43 S.Ct. 47. These rates were filed with the Interstate Commerce Commission, which then approved the rates as "reasonable and nondiscriminatory." *Id.* at 160–61, 43 S.Ct. 47. Keogh thereafter sued the carriers under the Anti–Trust Act, arguing that he was damaged by the elimination of competition that caused the rate increase. *Id.* In addressing whether a cause of action existed, the Court held that "[t]he rights as defined by the tariff cannot be varied or

enlarged by either contract or tort of the carrier." *Id.* at 163, 43 S.Ct. 47. The Court stated that "[t]he legal rights of shipper as against carrier *in respect to a rate* are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper." *Id.* (emphasis added). Therefore, it is the right of the regulated entity "in respect to a rate" that is governed by the approved tariff. *See id.*

Both the Supreme Court and our court have concluded that indirect challenges to filed rates are also barred. In 1998, the Court held that the filed rate doctrine bars claims for enhanced services because if such claims were granted, complainants would receive more services in exchange for the paid rate than the agency approved when it set the rates. *Am. Tel. & Tel. Co. v. Cent. Off. Tel. (AT & T)*, 524 U.S. 214, 224–25, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). In that case, plaintiff, a reseller of long-distance telephone services, sued AT & T for breach of contract and tortious interference with contract based on alleged defects in AT & T's provision of services and billing for such services. *Id.* at 216, 219–20, 118 S.Ct. 1956. The Federal Communications Commission, which is the agency enforcing the Federal Communications Act, required that carriers sell long-distance services to resellers "under the same rates, terms, and conditions as apply to other customers." *Id.* at 217, 118 S.Ct. 1956. Plaintiff, however, alleged that AT & T promised "various service, provisioning, and billing options in addition to those set forth in the tariff." *Id.* at 220, 118 S.Ct. 1956. The Court held that, although the plaintiff's breach of contract claim did not directly involve rates, the claim was barred because "[r]ates ... do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates

can be couched as a claim for inadequate services and vice versa." *Id.* at 223, 118 S.Ct. 1956. Because the enhanced services requested by the plaintiff were "privileges not included in the tariff," the Court concluded that the filed rate doctrine barred the plaintiff's claims. *Id.* at 226, 118 S.Ct. 1956. The Court also held that the filed rate doctrine barred the tortious interference claim because it was "wholly derivative of the contract claim for additional and better services." *Id.*

In *Hoffman*, we similarly concluded that, although claims that involve judicial enforcement of a tariff do not "infringe on discretionary authority vested in the agency," claims that "seek to *expand services* beyond what is provided for in the tariff ... indirectly challenge the reasonableness of the filed rates, and the filed rate doctrine bars the judiciary from considering such claims." 764 N.W.2d at 44 (emphasis added) (citing *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 222–23 (2d Cir.2001)). In analyzing *AT & T*, we determined that "[i]f the services requested in the litigation are not part of the original tariff obligations, the courts cannot, consistent with the filed rate doctrine, require performance of those services." *Hoffman*, 764 N.W.2d at 45. We did note, however, that some courts recognize that the filed rate doctrine does not preclude all damages claims measured with respect to the filed rate. *Id.* at 47 n. 7.

In 2007, the Wisconsin Supreme Court, which has recognized the filed rate doctrine since 1911, *see City of Manitowoc v. Manitowoc & N. Traction Co.*, 145 Wis. 13, 129 N.W. 925, 927 (1911), confronted a case similar to the one before us. *Schmidt v. N. States Power Co.*, 305 Wis.2d 538, 742 N.W.2d 294 (2007). In *Schmidt*, the Wisconsin court held that a tort claim against NSP alleging that stray voltage harmed a cow herd was not barred by the filed rate

doctrine because: (1) by seeking a reduction in stray voltage, the plaintiffs were not seeking a "privilege" within the meaning of the filed rate doctrine; and (2) conformance with the tariff did not eliminate NSP's common law duty of ordinary care. *Id.* at 310. The court in *Schmidt* declined to apply the filed rate doctrine, even though NSP had complied with a provision in the Wisconsin tariff that required NSP to reduce any stray voltage only if it exceeded 1 milliampere. *Id.* at 311. The court reasoned:

> Traditionally, the filed rate doctrine precluded a utility from giving extra-tariff benefits to one customer and not offering the same benefits to another. Stray voltage, however, is not a benefit that the [plaintiffs] or any other customers desire to receive. If [NSP] is responsible for the [plaintiffs'] stray voltage, it cannot claim that reducing stray voltage is a "service" or "privilege" that it provides. No authority exists for extending the doctrine to circumstances where a defendant is allegedly responsible for harming the plaintiff, e.g., providing stray voltage, but then claims that eliminating the harm is a "service" or "privilege" within the meaning of the doctrine.

*Id.* at 313. Former Supreme Court Chief Justice William Rehnquist's concurrence in *AT & T*, upon which the *Schmidt* court relied, made the same point—primarily that "[t]he tariff does not govern ... the *entirety of the relationship* between the common carrier and its customers.... It does not serve as a shield against all actions based in state law." 524 U.S. at 230–31, 118 S.Ct. 1956 (Rehnquist, C.J., concurring) (emphasis added). In *AT & T*, the Supreme Court determined that the plaintiff's tortious interference claim was barred by the filed rate doctrine, not because it arose out of tort, but because it was "wholly derivative of the contract claim for additional and better services." 524 U.S. at 226, 118 S.Ct. 1956. Thus, the distinction between those claims barred by the filed rate doctrine and those claims not barred rests on whether the contract itself—or some other duty—is the basis of the alleged harm. *See id.* (concluding that the tort claim "stem[med] from the alleged failure of AT & T to comply with its contractual relationship") (internal quotations omitted).

■ We conclude that the Siewerts' claim for injunctive relief to prevent further "nuisance in the form of stray current" is not barred by the filed rate doctrine, and we reverse the court of appeals on this point. The Siewerts' prayer for injunctive relief states:

> [The Siewerts] demand judgment ... [for] injunctive, mandamus or other relief compelling [NSP] to cease trespass and nuisance in the form of stray current over and through the property of [the Siewerts] and/or an order compelling [NSP] to reconstruct the distribution lines to reduce or eliminate stray current.

The filed rate doctrine precludes adding terms to a tariff and the district court therefore could not direct NSP to "reconstruct the distribution lines to reduce or eliminate stray current." But the Siewerts requested, in the alternative, an order "compelling [NSP] to cease trespass and nuisance in the form of stray current over and through the property of [the Siewerts]," without specifying how NSP must accomplish that task. Ordering NSP to abate the nuisance created by stray current, without directing NSP as to the particular means by which it was to do so, would not have added terms to the tariff or direct the scope of service to be provided.

■ We conclude that the Siewerts' claims for damages are also not barred by

the filed rate doctrine. In concluding that the Siewerts' claims for damages were not barred by the filed rate doctrine, the court of appeals began with the principle that under the filed rate doctrine "the scope of service [to be provided by the utility] cannot be directed by a court and must be left to the MPUC." *Siewert*, 757 N.W.2d at 917. The court of appeals relied on the definition of "service" in Minn.Stat. § 216B.02, subd. 6 (2010), which includes "the installation, removal, or repair of equipment or facilities for delivering or measuring such gas and electricity." *See Siewert*, 757 N.W.2d at 917. The court concluded that because the definition of "service" does not include paying damages, "[a] court that orders the payment of damages is not interpreting the tariff to require a past or future service." *Id.*

■ Although we agree with the court of appeals' ultimate conclusion, we reach it on different grounds. First, we presume that the Legislature does not intend to abrogate the common law unless it does so "by express wording or necessary implication." *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 377–78 (Minn.1990) (citing *In re Shetsky*, 239 Minn. 463, 469, 60 N.W.2d 40, 45 (1953)). We find nothing in Minn. Stat. chs. 216A or 216B that expressly or impliedly eliminates a utility's liability in tort. Minnesota Statutes § 216B.029, subdivision 1(a), requires the MPUC to "adopt standards for safety, reliability, and service quality for distribution utilities." Additionally, subdivision 1(d) of section 216B.029 requires electric distribution utilities to "comply with all applicable governmental and industry standards required for the safety, design, construction, and operation of electric distribution facilities, including section 326B.35." However, we can find nothing in either chapter 216A or 216B that eliminates the right of an in-

jured plaintiff to assert common law tort claims against electric distribution utilities.

Minnesota Statutes § 216B.09, subdivision 2 (2010), provides that the MPUC has authority to "ascertain and fix adequate and reasonable standards for the measurement of the quantity, quality, pressure, initial voltage, or other condition pertaining to the supply of service." This section deals with "the measurement of" voltage and the "accuracy of all meters" and not with how NSP is to provide electrical service. Minnesota Statutes § 216B.09, subdivision 1 (2010), does allow the MPUC to "ascertain and fix just and reasonable standards, classifications, rules, or practices to be observed and followed ... with respect to the service to be furnished." But, as explained by the Wisconsin Supreme Court in *Schmidt*, neither stray voltage nor reducing stray voltage is "the service to be furnished." *See Schmidt*, 742 N.W.2d at 313 (reducing stray voltage is not a "service" or "privilege" provided by the public utility).

Second, although the tariff at issue governs the parties' contractual relationship, it does not provide for, or limit, liability in tort. No provision in the tariff appears to address, or preclude, any claims against NSP except customer complaints relating to billing concerns. *See generally Northern States Power Company Tariff*, General Rules and Regulations (*NSP Tariff*) §§ 2.1–5.3 (2006). The terms of the tariff do not govern every aspect of the parties' relationships, *see AT & T*, 524 U.S. at 230–31, 118 S.Ct. 1956 (Rehnquist, C.J., concurring), especially when the MPUC has no ability to assess or award damages to parties harmed by torts, *see Peoples Natural Gas Co.*, 369 N.W.2d at 535–36.

Indeed, "we presume that the legislature does not abrogate the common law unless it does so expressly or by necessary implication." *Urban v. Am. Legion Dep't*

*of Minn.*, 723 N.W.2d 1, 10 (Minn.2006). Where, as here, legislation provides a regulatory agency jurisdiction over the provision of electricity, that jurisdiction does not abolish the duty arising out of common law negligence, as "it is a well-established rule that the enactment of safety statutes or legislation giving a commission jurisdiction over a certain activity does not abolish the duty arising under common-law negligence." *Schmidt*, 742 N.W.2d at 314 (internal quotations omitted). We see no express or implied abrogation of the Siewerts' tort claims for damages caused by stray voltage.[2]

Third, the Siewerts do not seek a reanalysis of the rate paid for electricity, either retrospectively or prospectively, implicitly or explicitly. Instead, the Siewerts request damages for harm experienced as a result of stray voltage—harm they have uniquely suffered as compared to other NSP customers. Additionally, the MPUC does not have exclusive authority over all claims involving public utilities, and in the past we have held that utilities may be liable for common law torts—whether regulated by the MPUC or not. *See, e.g., Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856, 864 (Minn.1984) (discussing and upholding the line of Minnesota cases that held that a gas distributor may be held liable for negligence).

Finally, the damages claims dismissed in *Hoffman* are not wholly analogous to the damages claims at issue here. In *Hoffman*, which involved plaintiffs who were seeking both injunctive relief and compensatory damages, we stated that "[t]hese damages are measured as the difference

---

**2.** We recently reaffirmed our strict analysis of legislatively granted power to administrative agencies. *See In re Hubbard*, 778 N.W.2d 313 (Minn.2010). In that case, Hubbard had applied to the City of Lakeland for a variance in connection with efforts to build a home overlooking the St. Croix River. *Id.* at 315–16. The City granted the variance, but the Department of Natural Resources (DNR) declined to certify the City's action, allegedly acting under the Minnesota Lower St. Croix Wild and Scenic Rivers Act, Minn.Stat. § 103F.351 (2010), and the Minnesota Wild and Scenic Rivers Act, Minn.Stat. §§ 103F.301–.345 (2010). *Hubbard*, 778 N.W.2d at 318. Those statutes authorized the DNR to "adopt rules that establish guidelines and specify standards for local zoning ordinances" and "adopt statewide minimum standards and criteria for the preservation and protection of shorelands within the boundaries of" designated rivers. *Id.* (quoting Minn.Stat. § 103F.351, subd. 4(a); Minn.Stat. § 103F.321, subd. 2). The DNR had also adopted rules that allowed the DNR to "in effect, veto a variance related to a[n] ... ordinance that a local government has granted" relating to the lower St. Croix River. *Id.* at 320 (quoting Minn. R. 6105.0351–.0550).

We concluded that no express authority existed for the DNR to certify the City's variance decision, concluding that "simply because an agency has broad authority to promulgate rules does not mean that the rules the agency promulgates can permissibly expand the substantive authority the legislature gave the agency." *Id.* at 321. In so concluding, we also noted our reluctance to find implied statutory authority and reiterated that implied powers must be " 'fairly drawn and fairly evident from the agency's objectives and powers expressly given by the legislature.' " *Id.* (quoting *Peoples Natural Gas Co.*, 369 N.W.2d at 534). We ultimately concluded that the DNR did not exercise broad authority to enforce the two statutes because the Legislature had given municipalities zoning authority to grant variances, and the Legislature had declined to give such power to the DNR. *Id.* at 322–24. *See also In re Qwest's Wholesale Serv. Quality Standards*, 702 N.W.2d 246, 261 (Minn.2005) ("[I]f nothing more than a broad grant of authority were needed to show that implied authority could be fairly drawn from the statutory scheme, the implied authority would be present in all cases in which the agency had a broad grant of authority."). We similarly see no reason here to give the MPUC authority unexpressed by the Legislature. We instead read the Legislature's silence to mean that the judiciary continues to exercise jurisdiction over common law tort claims against public utilities.

between what the appellants actually paid for the performance of the service not received and the presumably lesser amount they would have paid had the services not been required in the tariff." 764 N.W.2d at 47. Essentially, because the *Hoffman* plaintiffs' damages were directly linked to the filed rate itself, we concluded that the filed rate doctrine barred the claim. We noted that in *Schermer*, we similarly barred damages for "breach of agency approved tariff provisions." *Hoffman*, 764 N.W.2d at 47 (citing *Schermer*, 721 N.W.2d at 315). However, here, NSP's proposed interpretation effectively abrogates the courts' ability and right to adjudicate common law tort claims that do not fall within the scope of tariff interpretation.

NSP relies on the Supreme Court's decision in *Chicago & Alton Railroad Co. v. Kirby*, 225 U.S. 155, 163, 32 S.Ct. 648, 56 L.Ed. 1033 (1912), to argue that the Siewerts, if their claims go forward, would receive an undue advantage. However, allowing the Siewerts' common law tort claims to go forward presents no undue advantage over other consumers of NSP's electric distribution services because, as noted above, stray voltage is not a service, and the creation of such stray voltage is also not a service for which other consumers are paying. *See Schmidt*, 742 N.W.2d at 313. We hold that the filed rate doctrine does not preclude consideration of the Siewerts' claims for monetary damages or consideration of their claim for injunctive relief to abate the nuisance caused by stray voltage.

## II.

 We next address whether the primary jurisdiction doctrine bars judicial consideration, in the first instance, of the Siewerts' claims. The primary jurisdiction doctrine provides that a court can stay judicial proceedings "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion" to permit agency consideration of the matter. *Minn.-Iowa Television v. Watonwan Television Imp.*, 294 N.W.2d 297, 302 (Minn. 1980) (internal quotations omitted). Like the filed rate doctrine, the primary jurisdiction doctrine is judicially created and proposes to strike a proper relationship between courts and agencies " 'charged with particular regulatory duties,' " especially when an issue before the courts requires the particular competence and expertise of the agency. *City of Rochester v. People's Coop. Power Ass'n*, 483 N.W.2d 477, 480 (Minn.1992) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

 We consider two main factors in deciding whether to apply the primary jurisdiction doctrine: (1) whether the Legislature explicitly granted the agency exclusive jurisdiction over the issue; and (2) whether the issue raised is "inherently judicial." *Hoffman*, 764 N.W.2d at 49 (citing *City of Rochester*, 483 N.W.2d at 480).[3] Stated differently, a controlling consideration in the primary jurisdiction doctrine is "whether the case rais[es] issues of fact not within the conventional experience of judges, or whether the case require[s] the exercise of administrative discretion."

**3.** As we noted in *Hoffman*, other courts analyze the following factors to determine the applicability of the primary jurisdiction doctrine: "(1) the traditional experience of judges; (2) agency expertise and prerogative for discretion; (3) the likelihood that the court's ruling will differ from the agency and erode uniformity; and (4) whether the parties have already applied for agency adjudication." 764 N.W.2d at 49 n. 8 (citing *Am. Tel. & Tel. Co. v. MCI Commc'ns Corp.*, 837 F.Supp. 13, 16 (D.D.C.1993)).

*Hoffman,* 764 N.W.2d at 49–50 (internal quotations omitted).

■ In *City of Rochester,* we discussed primary jurisdiction extensively in the context of public utilities:

> Its application promotes proper relationships between the courts and administrative agencies ... and is used whenever enforcement of the claim requires the resolution of issues which ... have been placed within the special competence of an administrative body. Use of the doctrine ensures, first, that agencies are not passed over in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, and then, that uniformity and consistency result. The doctrine is inapplicable if the issues raised are inherently judicial, unless the legislature has explicitly granted exclusive jurisdiction to the administrative body.

483 N.W.2d at 480 (internal citations and quotations omitted). Essentially, the doctrine balances the expertise and subject matter of each branch of government involved to ensure that inherently judicial matters remain with the courts, while matters involving tariff interpretation and special expertise rest with respective agencies. *See also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,* 496 F.2d 214, 222 (3d Cir.1974) (holding that the primary jurisdiction doctrine barred consideration by the courts of the scope of tariff duties because the nature of the issue involved a "comparative evaluation of complex technical, economic and policy factors, as well as consideration of the public interest").

In *Minn.-Iowa Television,* we confronted a suit by KAAL, a local television station, against the Watonwan T.V. Improvement Association (Watonwan), the organization that operated the translator station in the county in which KAAL aired its programs. 294 N.W.2d at 301. After KAAL filed suit, Watonwan initiated a proceeding before the Federal Communications Commission (FCC) asking it to rule on the validity of the contract provision at issue under FCC regulations. *Id.* We held that the primary jurisdiction doctrine did not require the judiciary to dismiss the action in favor of the FCC proceeding because KAAL's claims were based on state law and did not require us "to rule on the validity of the contract provision under the FCC's rules and policies." *Id.* at 302.

■ Applying the factors from *City of Rochester,* then, we first consider whether the Legislature explicitly granted the MPUC exclusive jurisdiction over claims such as the Siewerts' claims for monetary damages resulting from loss of milk production and herd mortality and the Siewerts' claim for injunctive relief to require NSP to abate the nuisance resulting from the stray voltage passing through the Siewerts' property. The statute allows the MPUC to "review and ascertain the reasonableness of tariffs of rates, fares, and charges, or any part or classification thereof, and prescribe the form and manner of filing, posting, and publication thereof." Minn.Stat. § 216A.05, subd. 2(2) (2010). Section 216A.05 further provides:

> The functions of the commission shall be legislative and quasi-judicial in nature. It may make such investigations and determinations, hold such hearings, prescribe such rules, and issue such orders with respect to the control and conduct of the businesses coming within its jurisdiction as the legislature itself might make but only as it shall from time to time authorize. It may adjudicate all proceedings brought before it in which the violation of any law or rule administered by the Department of Commerce is alleged.

Minn.Stat. § 216A.05, subd. 1 (2010). The MPUC also has the power, with respect to "those matters within its jurisdiction," to "receive, hear, and determine all petitions filed with it . . . and may investigate, hold hearings, and make determinations upon its own motion to the same extent, and in every instance, in which it may do so upon petition." Minn.Stat. § 216A.05, subd. 5 (2010).

Similarly, Minn.Stat. § 216B.029, subd. 1(a), requires the MPUC to "adopt standards for safety, reliability, and service quality for distribution utilities." The MPUC has the power to remedy "practices, acts, or services" that the agency finds "unjust, unreasonable, insufficient, preferential, unjustly discriminatory, or otherwise . . . unlawful, or . . . any service which can be reasonably demanded [but] not . . . obtained" by changing that practice for the future. Minn.Stat. § 216B.23, subd. 2 (2010). However, as we concluded in our filed rate doctrine analysis, we can find nothing in either chapter 216A or 216B that eliminates the right of an injured plaintiff to assert common law tort claims against electric distribution utilities. None of these provisions suggests that the MPUC has sole jurisdiction over all claims that may be asserted against NSP, tariff-related or not. Nor is there anything in the list of the MPUC's enumerated powers that appears to give it exclusive jurisdiction over common law tort claims. Additionally, no provision in the tariff appears to address, or preclude, any claims except customer complaints relating to billing concerns. *See generally NSP Tariff* §§ 2.1–5.3. Indeed, the MPUC has no power to award damages to the Siewerts as a result of the harm they may have experienced. *See* Minn.Stat. § 216A.05, subd. 2 (2010) (defining powers vested in the MPUC).

In addition, the statutory scheme does not explicitly exclude courts from tariff interpretation, although it contemplates MPUC review and approval of tariffs. *Hoffman,* 764 N.W.2d at 49 (concluding that the "Minnesota Legislature has not vested in the MPUC exclusive jurisdiction over claims related to the tariffs of regulated utilities"). In *Hoffman,* we further held that,

[b]ecause the scope of NSP's services is dependent upon technical, undefined terms in the tariff, agency expertise will provide much-needed perspective for the construction of the NSP tariff. Moreover, the MPUC is in the best position to consider these questions, as the legislature entrusted the commission with setting the rates based on the scope of the services NSP was to perform.

*Id.* at 51. The facts of *Hoffman* required MPUC involvement in light of the required interpretation of the tariff to ascertain which services were covered under the tariff's terms.

We hold that the primary jurisdiction doctrine does not preclude judicial consideration of the Siewerts' claims for damages or for injunctive relief from nuisance. The claims at issue, which do not arise from the rate itself or its reasonableness, are common law tort claims and therefore inherently judicial.

NSP argues "[a] redesign of the distribution system would reshuffle the regulatory deck from an operational and logistical standpoint, as well as prompt significant rate reconsideration so that NSP could recoup the costs of the new facilities and service," which compels the preclusion of the Siewerts' claims. It is unclear, however, how NSP reaches this conclusion. This could be the result of a claim for injunctive relief, were the district court to issue an injunction requiring NSP to reconstruct its distribution

lines. But, as we have explained, the Siewerts sought in the alternative an injunction simply requiring NSP to abate the nuisance created by stray current without specifying how that would be accomplished.

A damages award would also not require a redesign or implementation of a new system. Additionally, a damages award would not require that NSP replace the multi-grounded system. Rather, damages would compensate for the harm the Siewerts have already experienced—and such a consideration is not beyond the knowledge and experience of the courts.[4] Claims for damages under common law tort theories are "inherently judicial" and properly rest with the courts. This is especially clear in light of the MPUC's inability to award the Siewerts any damages if it were to consider their claims.

Although NSP appears to be correct in its articulation of the rationale behind the primary jurisdiction doctrine, it misconstrues our holding in *Hoffman*. That case involved the determination of whether the language of the tariff itself required the services that plaintiffs were requesting; the claims here do not similarly rest on that determination. An award of damages based on common law tort theories does not require extensive interpretation of technical terms, nor does it impact the tariff at issue. We hold that the primary jurisdiction doctrine does not preclude judicial consideration of the Siewerts' common law tort claims for injunctive relief for relief from nuisance and for monetary damages.

## III.

■ Finally, we address whether the Siewerts' claims are barred by the statute of repose for improvements to real property under Minn.Stat. § 541.051. Minnesota Statutes § 541.051, subdivision 1(a), imposes a statute of repose that does not permit any

> action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal ... arising out of the defective and unsafe condition of an *improvement to real property* ... more than ten years after substantial completion of the construction.

(Emphasis added.) NSP argues that the statute of repose bars consideration of the Siewerts' claims because: (1) an electric distribution system constitutes an "improvement to real property" under Minn. Stat. § 541.051; and (2) it has been more than 10 years since the substantial completion of the improvement.

■ A claim not barred by the statute of repose must still be brought within two years after discovery of the injury. *Id.*, subd. 1(a). In interpreting the statute of repose, we "strive to give effect to the plain meaning of the words of the statute without resort to technical legal constructions of its terms." *Pac. Indem. Co. v. Thompson–Yaeger, Inc.*, 260 N.W.2d 548, 554 (Minn.1977), *superseded by statute*, Minn.Stat. § 541.051 (1980), *as recognized in O'Brien v. U.O.P., Inc.*, 701 F.Supp. 714, 717 (D.Minn.1988). We apply a "common-sense interpretation" of the phrase "improvement to real property," which is defined as " 'a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary

---

4. We express no opinion here on the recoverability of future damages under the primary jurisdiction doctrine.

repairs.' " *Id.* (quoting *Kloster–Madsen, Inc. v. Tafi's, Inc.,* 303 Minn. 59, 63, 226 N.W.2d 603, 607 (Minn.1975)).

Thus, the three main factors that we use to ascertain whether something is an "improvement to real property" are whether the addition or betterment is permanent, whether it enhances the capital value of the property, and whether it is designed to make the real property more useful or valuable, rather than intended to restore the property's previous usefulness or value. *See State Farm Fire & Cas. v. Aquila Inc.,* 718 N.W.2d 879, 884 (Minn.2006); *Sartori v. Harnischfeger Corp.,* 432 N.W.2d 448, 451 (Minn.1988) (holding that a crane fabricated on a mining facility and operated for 19 years qualified as "a permanent addition to or betterment of real property").

Utilities and similar installations have generally been considered real property improvements in Minnesota. *See, e.g., Aquila,* 718 N.W.2d at 884 (natural gas pipeline); *Lietz v. N. States Power Co.,* 718 N.W.2d 865, 869–71 (Minn.2006) (anchor used to support a utility pole); *Frederickson v. Alton M. Johnson Co.,* 402 N.W.2d 794, 796–97 (Minn.1987) (shopping center's electrical system); *Capitol Supply Co. v. City of St. Paul,* 316 N.W.2d 554, 555 (Minn.1982) (sewer system); *Kemp v. Allis–Chalmers Corp.,* 390 N.W.2d 848, 850–51 (Minn.App.1986) (electrical cable installed as part of electrical transmission system).

In *Aquila,* a natural gas leak from a pipeline caused an explosion and fire that damaged real and personal property. 718 N.W.2d at 881–82. We concluded that the distribution system constituted an "improvement to real property" because the pipeline involved "the expenditure of labor or money," the installation was a "permanent addition to or betterment of real property" as opposed to an "ordinary re-

pair," and the system enhanced the capital value of the property that it served. *Id.* at 884 (internal quotations omitted) (citing in part Minn.Stat. § 541.051, subd. 1(a)). In *Lietz,* we similarly concluded that a utility pole support anchor that was being used in the construction of a fiber-optic communication system improved the real property for purposes of Minn.Stat. § 541.051. 718 N.W.2d at 868–71.

◼ The Siewerts argue that even if the multi-grounded wye system is an improvement to real property, their claims are excepted from the statute of repose by Minn.Stat. § 541.051, subd. 1(d): "Nothing in this section shall apply to actions for damages resulting from negligence in the maintenance, operation or inspection of the real property improvement against the owner or other person in possession." The court of appeals held that the Siewerts' claims for strict liability and nuisance "plainly implicate a service and not an individual improvement" and that the negligence claims fall within the statutory exception to the statute of repose. *Siewert,* 757 N.W.2d at 922–23.

We agree with the court of appeals' conclusion that the statute of repose does not bar the Siewerts' claims. Here, although the 10–year statute of repose period passed before the Siewerts bought the farm, we hold that the exception to the statute of repose under Minn.Stat. § 541.051, subd. 1(d), for negligent maintenance, operation, or inspection applies to the Siewerts' claims. Therefore, their claims may proceed, even though the system constitutes an "improvement to real property."

The exception provides that the time restrictions do not apply "to actions for damages resulting from negligence in the *maintenance, operation or inspection* of the real property improvement against the

owner or other person in possession." Minn.Stat. § 541.051, subd. 1(d) (emphasis added). There are two requirements to the exception—one based on what kind of action is involved and the other based on whom the action is against. *See id.* The party who claims that the exception applies bears the burden of proof. *Aquila,* 718 N.W.2d at 886. The Siewerts' claims easily satisfy the second requirement—that the action be "against the owner or other person in possession." *See* Minn. Stat. § 541.051, subd. 1(d). The Siewerts' claims are against NSP, who is the owner of the electric distribution system's components.

We conclude that the Siewerts' claims also satisfy the first requirement—that the action is based on negligent "maintenance, operation, or inspection." *See* Minn.Stat. § 541.051, subd. 1(d). The Siewerts claim that their damages resulted from NSP's maintenance and operation of the electric distribution system—not on any particular defect relating to the system itself. It is not the multi-grounded system itself that is causally related to the injuries the Siewerts sustained[5]—it is the way in which NSP allegedly improperly operated the system, thereby allowing unintended discharges of electricity in the form of stray voltage.

Similarly, the focus of the Siewerts' complaint is on NSP's role in maintaining and operating the multi-grounded system. One of the Siewerts' negligence claims is based on "failing to adequately test and inspect" the system. The Siewerts' other negligence claims involve "maintenance" of the system and negligence in "handling, supplying, distributing, selling, and placing ... electrical power," which implicate NSP's services, not the improvement itself. We hold that the statute of repose does not preclude consideration of the Siewerts' claims for damages or for injunctive relief related to the maintenance, operation, or inspection of the electrical distribution system. We therefore remand to the district court for further proceedings consistent with this opinion.

Affirmed.

GILDEA, C.J., and DIETZEN, J., concurring in part, dissenting in part.

ANDERSON, G. BARRY, and MEYER, JJ., concurring.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Chief Justice (concurring in part, dissenting in part).

The Siewerts brought several tort claims against NSP, alleging that NSP's delivery of electricity caused damage to their dairy farm. The Siewerts sought damages and injunctive relief based on their allegations that the way in which NSP delivered electricity violated the common law.[1] The majority holds that the filed rate doctrine bars some of the Siewerts' claims for injunctive relief, but not others, and that the doctrine does not bar the claims for damages. I would hold that the filed rate doctrine bars all of the claims.

---

**5.** As part of their claims for injunctive relief, the Siewerts have claimed defects in the design of the multi-grounded wye system itself. Because those claims do not relate to the "maintenance, operation, or inspection" of the system, they are barred by the statute of repose.

**1.** The Complaint alleges negligence, strict liability, nuisance and trespass theories. The district court dismissed the trespass claim on partial summary judgment and that ruling is not before us.

We have applied the filed rate doctrine in two recent cases. *See Hoffman v. N. States Power Co.,* 764 N.W.2d 34 (Minn. 2009); *Schermer v. State Farm Fire & Cas. Co.,* 721 N.W.2d 307 (Minn.2006). In those cases, we discussed the considerations that underlie the filed rate doctrine, including separation of powers, comity, justiciability, and nondiscrimination among ratepayers. *Hoffman,* 764 N.W.2d at 42; *Schermer,* 721 N.W.2d at 314–15. In my view, the decision as to whether the doctrine should be applied to bar the Siewerts' claims depends on the extent to which their claims implicate the considerations that underlie the doctrine. I therefore begin with an analysis of this question.

With respect to the separation-of-powers and comity considerations, we have recognized that "prescribing or fixing rates for a public utility involves a legislative function which may not be usurped by the courts." *N. States Power Co. v. City of St. Paul,* 256 Minn. 489, 493, 99 N.W.2d 207, 211 (1959); *see also Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n,* 369 N.W.2d 530, 535 (Minn.1985) (describing the public regulation of utilities as "an intricate, ongoing process," subject to "an ever-widening set of consequences and adjustments"). The Legislature has delegated this function to the Minnesota Public Utilities Commission (MPUC). *See* Minn.Stat. § 216A.05, subd. 1 (2010) ("The functions of the [MPUC] shall be legislative and quasi-judicial in nature. It may make such investigations and determinations, hold such hearings, prescribe such rules and issue such orders with respect to the control of the businesses coming within its jurisdiction as the legislature itself might make...."). The functions the Legislature assigned to the MPUC include the setting of rates a utility may charge for its service. *See* Minn.Stat. § 216B.16, subd. 5 (2010) ("If, after the hearing, the commission finds the rates to be unjust or unrea-

sonable or discriminatory, the commission shall determine the rates to be charged or applied by the utility for the service in question and shall fix them by order...."); *see also* Minn.Stat. § 216B.03 (2010) ("Every rate made, demanded, or received by any public utility ... shall be just and reasonable.").

The Legislature has also delegated to the MPUC the responsibility to "adopt standards for safety, reliability, and service quality for distribution utilities," Minn.Stat. § 216B.029, subd. 1 (2010), and provided that regulated utilities, like NSP, must "comply" with those standards. Minn.Stat. § 216B.029, subd. 1(d) ("Electrical distribution utilities shall comply with all applicable governmental and industry standards required for the safety, design, construction, and operation of electric distribution facilities...."); *see also* Minn.Stat. § 216B.04 (2010) ("Every public utility shall furnish safe, adequate, efficient, and reasonable service...."). Finally, and specifically with respect to electrical services, the MPUC has authority to "ascertain and fix adequate and reasonable standards for the measurement of the quantity, quality, pressure, initial voltage, or other condition pertaining to the supply of service." Minn.Stat. § 216B.09, subd. 2 (2010).

To effectuate the MPUC's authority, the Legislature requires that all public utilities "file with the commission schedules showing all rates, tolls, tariffs, and charges which it has established." Minn.Stat. § 216B.05, subd. 1 (2010). Public utilities also must file with the MPUC "all rules that, in the judgment of the [MPUC], in any manner affect the service or product, or the rates charges or to be charged for any service or product." Minn.Stat. § 216B.05, subd. 2 (2010). The standards and rates that govern regulated utilities therefore are reflected in the tariffs those

utilities file with the MPUC. Because the rates set forth in the agency-approved tariff are conclusive, the Legislature also prohibits "any person [from] knowingly receiv[ing] or accept[ing] any service from a public utility for a compensation greater or less than that prescribed in the schedules" filed with the MPUC. Minn.Stat. § 216B.06 (2010).

Because the Legislature has specifically charged the MPUC with adopting standards regulating how NSP is to deliver electricity and setting the rate that NSP may charge for that delivery, I would hold that the Siewerts' claims directly trigger the separation-of-powers and comity considerations that underlie the filed rate doctrine.[2] In their claims, the Siewerts request that the judiciary order NSP to deliver electricity differently than the method set forth in the agency-approved tariff. The Siewerts also request that the judiciary assess damages against NSP because NSP has not delivered electricity in a manner different from that provided in the tariff. The Siewerts specifically acknowledged in their brief to our court that their case "is not based upon breach of tariff obligations."[3] Rather, the Siewerts cite the common law as the source for the judiciary's authority to order NSP to deliver electricity differently. But the Legislature has assigned to the MPUC the function of defining the manner in which NSP is to deliver electricity. *See, e.g.,* Minn.Stat. § 216B.029, subd. 1(a) ("The commission ... shall adopt standards for the safety, reliability and service quality for distribution utilities."); *see also* Minn. Stat. §§ 216B.09, subds. 1, 2 (2010). Separation-of-powers and comity considerations counsel that the judiciary defer to

**2.** The concurrence argues that "disputes arising from common law duties fall within the purview of the judicial branch" and that therefore such disputes are outside the scope of the filed rate doctrine. *Infra* at C–2. I do not disagree that claims arising from common law duties often fall within the purview of the judicial branch. But, in my view, the concurrence asks the wrong question in determining the applicability of the filed rate doctrine. Whether a claim is or is not barred by the filed rate doctrine does not depend on the theory the plaintiff pleads or whether the claim is based on the common law or a statute. *See Keogh v. Chi. & N.W. Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (concluding that the legal rights as defined by the tariff "cannot be varied or enlarged by either contract or tort or the carrier"). As one federal court aptly put it, "[t]he applicability of the filed rate doctrine is determined by the statutes empowering agencies to approve rates, not the statutes under which a plaintiff alleges a cause of action." *See Gelb v. Am. Tel. & Tel. Co.*, 813 F.Supp. 1022, 1026 n. 5 (S.D.N.Y.1993). Instead of looking to the origins of the claims, as the concurrence does, I look to whether the claim potentially implicates the underlying principles of the filed rate doctrine: justiciability, separation of powers and non-discrimination.

This approach guards against judicial interference in the intricate process of utility regulation. Adopting the concurrence's interpretation of the filed rate doctrine as not barring claims grounded in common law duties, regardless of how these duties interact with the regulatory functions of the agencies, largely eviscerates the doctrine.

**3.** This case is different from *Hoffman* in that in *Hoffman* we found that to the extent the plaintiffs were seeking to enforce the terms of the tariff by claiming that NSP had breached its maintenance obligations under the tariff, the filed rate doctrine would not bar that claim. *See* 764 N.W.2d at 45. Accordingly, as we recognized in *Hoffman*, the filed rate doctrine would not bar the Siewerts' claims if they sought merely to enforce obligations set forth in the tariff. 764 N.W.2d at 44 ("[A]t least in the absence of a legislative decision to vest exclusive jurisdiction in the agency, the filed rate doctrine does not bar a court from considering a request to enforce the clear terms of an agency-approved tariff."). But the Siewerts do not bring such a claim. Rather, it is undisputed that the tort claims are grounded on the Siewerts' assertion that NSP needed to deliver electricity in a way other than the way set forth in the tariff.

that assignment. *See Hoffman,* 764 N.W.2d at 44 (noting that claims that seek to add services to those the utility is required by the tariff to perform "indirectly challenge the reasonableness of the filed rates").

Regarding the justiciability considerations relevant to the filed rate doctrine, the means by which a utility provides electricity is inherently bound up with agency procedures and rate determinations. The judiciary is not in the position to order NSP to adopt one electrical distribution system over another without potentially undermining the nuanced balancing and determinations made by MPUC in accepting NSP's tariff. Nor is the judiciary in the position to determine what rate MPUC would have allowed NSP to charge if NSP had adopted an entirely different distribution system, as the Siewerts contend it should have. *See Schermer,* 721 N.W.2d at 315 (discussing justiciability consideration). Because the Siewerts' claims are grounded in their theory that NSP must deliver electricity in a manner different from that outlined in the tariff, the justiciability considerations that underlie the filed rate doctrine are squarely implicated.[4]

After assessing the separation-of-powers, comity and justiciability considerations that underlie the filed rate doctrine, I would hold that the doctrine operates to bar the Siewerts' claims. In apparent rec-ognition of the separation-of-powers, comity and justiciability considerations, the majority holds that the filed rate doctrine bars some of the Siewerts' claims for injunctive relief. *See Hoffman,* 764 N.W.2d at 45 ("If the services requested in the litigation are not part of the original tariff obligations, the courts cannot, consistent with the filed rate doctrine, require performance of those services.").

But the majority holds that the filed rate doctrine does not bar "the Siewerts' claims for injunctive relief to prevent further nuisance" upon their property. The majority concludes that this claim for injunctive relief survives the filed rate doctrine because the district court could order NSP to accede to the Siewerts' demands "without specifying how NSP must accomplish that task." The majority states that an order granting the requested relief "would not have added to the terms of the tariff or direct the scope of service to be provided." I disagree. This case is about the manner in which NSP provides electrical service. The Siewerts contend that NSP is causing a nuisance through the manner in which it provides electricity. Any order to change that manner is still an order to NSP that it change how it delivers electricity. As such, the filed rate doctrine, as our precedent has interpreted and applied it, operates to bar such an order. *See Hoffman,* 764 N.W.2d at 45.

---

4. The non-discrimination principle that underlies the doctrine reflects the awareness that granting judicial relief to one or a few customers would amount to different treatment among ratepayers of the same service. *See Schermer,* 721 N.W.2d at 315 ("If the court were to retroactively adjust the rates of only the Class members, it would inevitably disrupt the balancing of interests achieved by the [agency] ... because the court has no jurisdiction to reallocate rates among other customer classes...."). Given the individualized nature of the damages claims the Siewerts present, this principle is likely not implicated by their claims and so I do not consider it further. We reached a different conclusion in *Hoffman,* but in that case, the damages claim was not individualized because no homeowner claimed to have suffered property damage from NSP's failure to perform the obligations at issue. *See Hoffman,* 764 N.W.2d at 39; *see also id.* at 48 ("Because appellants' claim for compensatory damages ... would lead to discrimination between ratepayers, we hold that the filed rate doctrine bars this claim.").

The majority also holds that the filed rate doctrine does not bar the Siewerts' claims for damages. In my view, the same analysis that compels the conclusion that the filed rate doctrine bars the claims for injunctive relief logically leads to the same conclusion for the damages claims. If the judiciary cannot, consistent with the filed rate doctrine, require the regulated entity to perform additional services beyond those defined in the tariff, it follows that the judiciary cannot assess damages against the entity for failing to perform those additional services.[5]

The majority attempts to find support for its conclusion that the filed rate doctrine does not bar the damages claims in Chief Justice Rehnquist's concurrence in *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (*AT & T*), 524 U.S. 214, 228–31, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (Rehnquist, C.J., concurring). In his concurrence, the Chief Justice said:

> The tariff does not govern, however, the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose on petitioner to refrain from intentionally interfering with respondent's relationships with its customers by means other than failing to honor unenforceable side agreements, or to refrain from engaging in slander or libel, or to satisfy other contractual obligations.

*Id.* at 230, 118 S.Ct. 1956. The majority uses this quotation to support its conclusion that "the distinction between those claims barred by the filed rate doctrine and those claims not barred rests on whether the contract itself—or some other duty—is the basis of the alleged harm." Because the majority sees some other duty (i.e., the common law), and not the tariff, as the basis of the Siewerts' alleged harm, the majority concludes that the filed rate doctrine does not bar the damages claims. The majority's analysis misunderstands *AT & T*.

The plaintiff in *AT & T*, Central Office Telephone, Inc. (COT), brought suit for breach of contract and tortious interference with contract arising from AT & T's provision of long-distance communication services. 524 U.S. at 216, 118 S.Ct. 1956. The relationship between AT & T and COT was the subject of a tariff that federal law required be filed with the Federal Communications Commission. *Id.* at 216–17, 118 S.Ct. 1956. COT's common law claims "were not limited by [the] tariff but also included certain understandings [the plaintiff's] president derived from reading [the defendant's] brochures and talking with its representatives." *Id.* at 220, 118 S.Ct. 1956.

If the majority's analysis were correct, COT's extra-tariff claims should have withstood a filed rate challenge because the claims were not based on duties created in the tariff, but were based on common law obligations. The Court however found

---

5. I do not disagree with the majority that in the legislation granting authority to the MPUC, the Legislature did not expressly abrogate the common law. But the absence of abrogation does not answer the question of whether the filed rate doctrine dictates the dismissal of the Siewerts' claims. As discussed above, because the Siewerts' claims directly trigger the separation-of-powers, comity and justiciability considerations that underlie the filed rate doctrine, proper application of the doctrine dictates that the claims be dismissed. The majority also cites *In re Hubbard*, 778 N.W.2d 313 (Minn.2010), for the proposition that legislative delegations of authority to administrative agencies must be interpreted strictly. Again, I do not disagree as a matter of principle, but that principle is not directly applicable to the prudential considerations that underlie the filed rate doctrine.

that the claims were barred. *Id.* at 226, 118 S.Ct. 1956. ("Because [plaintiff] asks for privileges not included in the tariff, its state-law claims are barred...."). Because the source of the obligation at issue in both COT's breach of contract claim and its tort claim was outside the tariff, and the additional obligations COT sought to enforce in its common law claims related to the very subject that was regulated in the tariff, the filed rate doctrine barred COT's common law claims. *See id.* at 224–25, 118 S.Ct. 1956 (noting that "the additional services and guarantees that [plaintiff] claims it was entitled to ... all pertain to subjects that are *specifically addressed* by the filed tariff") (emphasis original); *see also id.* at 229, 118 S.Ct. 1956 (Rehnquist, C.J., (concurring) (noting that the filed rate doctrine "pre-empt[s] only those suits that seek to alter the terms and conditions provided for in the tariff")).

As *AT & T* makes clear, the applicability of the filed rate doctrine turns not, as the majority concludes, on the legal source of the cause of action. *See* 524 U.S. at 225–26, 118 S.Ct. 1956; *see also Keogh,* 260 U.S. at 163, 43 S.Ct. 47. Rather, the question of whether the filed rate doctrine bars particular claims depends on the extent to which judicial resolution of those claims would entangle the judiciary in the ratemaking process the Legislature has delegated to the agency.[6]

There is no dispute in this case that the damages the Siewerts claim to have suffered are based on their theory that NSP did not deliver electricity in the safest or most prudent way. But the tariff provides how NSP is to deliver electricity. *See, e.g., Northern State Power Company Tariff,* General Rules and Regulations § 5 (2006). Ordering NSP to deliver electricity differently or awarding the Siewerts damages because NSP did not deliver electricity differently is an indirect challenge to the legislative rate-making function. *AT & T,* 524 U.S. at 223, 118 S.Ct. 1956 ("Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa."). In my view, the filed rate doctrine bars such claims, whether for injunctive relief or for damages.[7]

**6.** The majority also relies heavily on the Wisconsin Supreme Court decision of *Schmidt v. N. States Power Co.,* 305 Wis.2d 538, 742 N.W.2d 294 (2007), to conclude that the filed rate doctrine does not bar stray voltage claims because the plaintiffs are not seeking a "privilege" within the meaning of the filed rate doctrine and conformance with the tariff does not eliminate the common law duty of due care. *See id.* at 310–11. In my view, *Schmidt* does not properly recognize the serious separation-of-powers concerns raised by the filed rate doctrine. Proper application of the filed rate doctrine requires an examination of the nature and extent of the judicial interference with the complex regulatory system that would result from judicial resolution of the claims. *See, e.g., AT & T,* 524 U.S. at 230–31, 118 S.Ct. 1956 (Rehnquist, C.J., concurring) (explaining that, while the filed rate doctrine does "not serve as a shield against all actions based in state law," its purpose is

"to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff"). The analysis in *Schmidt,* in essence, ignores this dispositive consideration, and I therefore would not follow it.

**7.** The district court dealt with the applicability of the filed rate doctrine summarily, relying on *Ferguson v. N. States Power Co.,* 307 Minn. 26, 239 N.W.2d 190 (Minn.1976). *Ferguson* is inapposite because it does not even mention the filed rate doctrine and it does not appear that any arguments under the filed rate doctrine were raised in the case. Similarly, *Mahowald v. Minn. Gas Co.,* 344 N.W.2d 856 (Minn.1984), on which the majority relies for the proposition that the filed rate doctrine does not apply to common law tort claims, does not address the filed rate doctrine. Because they do not even mention or purport to

I do not contend that the filed rate doctrine bars all common law claims. There may be any number of common law claims that would not implicate the principles of separation of powers and comity, justiciability, and non-discrimination that underlie the doctrine. But the Siewerts challenge the actual way in which electricity is distributed and ask the judicial branch to conclude that the electricity should have been delivered in a different manner, and to award either damages or injunctive relief on that basis. Such claims necessarily entangle the judiciary in the ratemaking process and the filed rate doctrine therefore bars them.[8]

In sum, I would hold that the filed rate doctrine bars all the Siewerts' claims. Because I would conclude the claims are barred by the filed rate doctrine, I would not reach the issues of the primary jurisdiction doctrine or the statute of repose.

DIETZEN, Justice (concurring in part and dissenting in part).

I join in the concurrence and dissent of Chief Justice Gildea.

ANDERSON, G. Barry, Justice (concurring).

I concur in the opinion of the court but write separately because of my concern that we proceed cautiously with the development of the filed rate doctrine.[1]

I begin this discussion with the cautionary words of Justice Jackson, who observed that administrative agencies have become "a veritable fourth branch of the Government, which has deranged our three-branch legal theories...." *Fed. Trade Comm'n v. Ruberoid Co.*, 343 U.S. 470, 487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting in part). While there have been congressional efforts (and equivalent efforts in Minnesota) to rein in administrative agencies, including the Administrative Procedure Act, Pub.L. No. 79–404, 60 Stat. 237 (1946) (codified as amended in scattered sections of 5 U.S.C.), and the Negotiated Rulemaking Act of 1990, Pub.L. No. 101–648, 104 Stat. 4969 (1990) (codified at 5 U.S.C. §§ 561–70 (2006)), the fact remains that administrative agencies continue to increase in size, power, and scope of authority.

Nonetheless, Minnesota has adopted the filed rate doctrine providing some insulation from litigation in district court for entities, such as Northern States Power (NSP), that are regulated by administrative agencies, such as the Minnesota Public Utilities Commission (MPUC); we have previously recognized that one of the un-

---

address the filed rate doctrine, *Ferguson* and *Mahowald* cannot be read to support the conclusion that the doctrine does not apply in the context of common law tort claims.

8. The MPUC also has broad authority to resolve complaints customers raise regarding the service that public utilities deliver. Minn. Stat. § 216B.098, subd. 6 (2010) ("In addition to any other authority, the [MPUC] has the authority to resolve customer complaints against a public utility ... whether or not the complaint involves a violation of this chapter."); *see also* Minn.Stat. § 216B.17, subd. 1 (2010) ("[U]pon a complaint ... by any 50 consumers of the particular utility that ...

any service in connection therewith is in any respect unreasonable, insufficient, or unjustly discriminatory, or that any service is inadequate ... the [MPUC] shall proceed, with notice, to make such investigation as it may deem necessary."). But we have held that the MPUC does not have authority to award monetary refunds to injured customers. *Peoples Natural Gas Co.*, 369 N.W.2d at 536.

1. Although I conclude that the Siewerts' claims properly survived a motion for summary judgment on the basis of the filed rate doctrine, it is important to note that my conclusion and reasoning do not reach the merits of the Siewerts' claims.

derlying rationales for the filed rate doctrine is a concern over the separation of powers. *Hoffman v. N. States Power Co.*, 764 N.W.2d 34, 42 (Minn.2009) (noting that "the doctrine recognizes that rate-setting is a legislative function and that courts are 'ill-suited' to determine the reasonableness of rates established by the agency"); *Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307, 314 (Minn.2006) (stating that our "precedent recogniz[es] that ratemaking is a legislative function"). The concurrence and dissent authored by the Chief Justice correctly notes that the Legislature delegated to the MPUC the prescribing and fixing of rates, along with authority to adopt safety standards. *Supra* at CD–2 (citing Minn.Stat. §§ 216A.05, subd. 1; 216B.16, subd. 5; 216B.03; 216B.029, subd. 1 (2010)).

Clearly, the Legislature has expressly delegated certain authority to the MPUC, and the judiciary must be mindful of that authority when considering claims against entities, like NSP, that are regulated by the MPUC. But disputes arising from common law duties fall within the purview of the judicial branch, and when determining whether the filed rate doctrine bars a plaintiff's claims, we should be cautious about too readily, and perhaps unnecessarily, ceding authority over such claims by reading statutes pertaining to the MPUC and NSP's tariff in too broad a fashion, invoking separation-of-powers concerns when claims may in fact not be contrary to the tariff or contravene the authority of the MPUC. Here, the tariff does not prescribe one specific manner in which NSP is to deliver electricity. The tariff is broad enough that NSP could arguably deliver electricity and provide services in a manner that is in accord with the tariff, and yet violate common law duties. At the same time, the tariff appears to be expansive enough that NSP can, hypothetically, deliver electricity and provide services in a manner that would not violate the tariff, common law tort duties, or be a nuisance. Accordingly, I do not view the Siewerts' claims as requesting damages against NSP in a manner that contravenes the tariff, nor do I view their injunctive relief claim for nuisance abatement as requiring NSP to provide services above and beyond the tariff.

The filed rate doctrine is still in fledgling form in Minnesota, having been adopted only four years ago in *Schermer*, 721 N.W.2d at 317, and this case requires us to further determine the contours of how we should apply the doctrine in this state. An overly expansive reading of the filed rate doctrine, absent legislative direction, creates its own set of separation-of-powers concerns, leading to, potentially, an invasion of powers delegated to the judicial branch. In my view, based on the current grant of authority by the Legislature to the MPUC, extending the judicially created filed rate doctrine to prohibit courts from considering a request for a temporary injunction or damages for an alleged breach of common law tort duties by an entity regulated by the MPUC, under these facts, would be an unnecessary expansion of the filed rate doctrine. Although the Chief Justice views this approach as "largely eviscerat[ing] the doctrine," I do not agree that the filed rate doctrine is an exception to the rule of strictly interpreting legislative delegations of authority to administrative agencies and presuming that the Legislature does not intend to abrogate the common law unless it does so by express wording or necessary implication. *See* CD–4 n. 2. Instead, when considering the underlying rationales of the filed rate doctrine—separation of powers, comity, justiciability, and nondiscrimination among ratepayers—in determining when to apply the doctrine, I believe that the nature of the claim factors

into our analysis of whether the claim alters the terms of a tariff and calls into question the reasonableness of the rate, because tariffs and statutes can be interpreted broadly or narrowly. *See Satellite Sys., Inc. v. Birch Telecom of Okla.,* 51 P.3d 585, 588 (Okla.2002) (noting that "[a] presumption favors the preservation of common-law rights" and that courts should look at whether the state legislature has expressed an intent, "either explicitly or implicitly, that the policies supporting a state rate tariff doctrine were intended to abolish a common law ... claim"); *cf. Pink Dot, Inc. v. Teleport Commc'ns Grp.,* 89 Cal.App.4th 407, 107 Cal.Rptr.2d 392, 398 (2001) (noting differences between the federal filed rate doctrine and California's filed rate doctrine, and concluding that the limitations on California's doctrine do not preclude some state statutory and common law claims).

In sum, the filed rate doctrine allows us to protect the prerogative of the Legislature to delegate its rate-setting function to state administrative agencies. But, when applying the doctrine, we must not cede authority of the judicial branch in the name of protecting the authority of the legislative branch.

MEYER, Justice (concurring).

I join in the concurrence of Justice G. Barry Anderson.